1
2
3                        UNITED STATES DISTRICT COURT
4                               DISTRICT OF NEVADA
5                                      * * *
6   ALEX MARQUEZ,                           Case No. 3:15-cv-00492-MMD-CLB
7                        Petitioner,                        ORDER
            v.
8   TIM GARRETT[1], *et al.*,
9                        Defendants.
10

11   **I.     SUMMARY**

12          Petitioner Alex Marquez filed a petition for writ of habeas corpus under 28 U.S.C.

13   § 2254. (ECF No. 14.) In 2005, Carlos Ruiz drove Brian Snapp, Eduardo Camacho, and

14   Marquez to Snapp's former apartment after Snapp was asked to move out. Snapp,

15   Camacho and Marquez beat the apartment occupants with baseball bats and a claw

16   hammer. One occupant was stabbed and bled to death. A jury convicted Marquez and

17   his three codefendants of: (1) first-degree murder with use of a deadly weapon, (2)

18   attempted robbery with use of a deadly weapon, (3) burglary with use of a deadly weapon,

19   and (4) two counts of battery with use of a deadly weapon. (ECF No. 20-2.) Marquez was

20   sentenced to 47 years to life imprisonment. (*Id.*) Marquez unsuccessfully challenged his

21   convictions on direct appeal and in postconviction proceedings. (ECF Nos. 20, 38-25.)

22   ///

23   ///

24   ///

25

26   ───────────────
            [1]According to the state corrections department's inmate locator page, Marquez is
27   incarcerated at Lovelock Correctional Center. The department's website reflects Tim
     Garrett is the warden for that facility. At the end of this order, the Court directs the Clerk
28   to substitute Tim Garrett for Respondent E.K. McDaniel, under Rule 25(d) of the Federal
     Rules of Civil Procedure.

1      In the remaining grounds of his Petition,[2] Marquez challenges the judgment on the

2  grounds his statements to police were obtained in violation of *Miranda*, the state district

3  court erred by joining his trial with that of his codefendants, trial counsel was ineffective,

4  and his convictions are unsupported by sufficient evidence.

5      This matter is now before the Court for adjudication on the merits.

6  **II.   FACTUAL BACKGROUND**

7      The following facts describe the events leading up to the charges brought against

8  Marquez.[3] Further factual information about Marquez's state court proceedings

9  accompany the Court's analysis of each of Marquez's stated grounds for relief.

10      **A.   Brian Snapp receives notice to move out of his friend's apartment.**

11      Robert "Bobby" Andrew Wood testified he met Brian Snapp while they worked at

12  Target and Snapp moved into Bobby Wood's apartment in Reno, Nevada, about a month

13  and a half before November 8, 2005. (ECF No. 17-2 at 38, 41-43.) Snapp was aware that

14  Bobby Wood kept money in a small safe in his closet and that he had received settlement

15  money for an auto accident. (*Id.* at 48-49.)

16      Bobby Wood expected Snapp to co-lease the apartment, but Snapp vanished, so

17  Bobby's brother, William "Billy" Oliver Wood, and their long-time friend, Jeff Lowe, moved

18  into the apartment instead. (*Id.* at 43-45, 98-99.) When Snapp unexpectedly returned,

19  Bobby Wood permitted him to stay at the apartment for a couple of weeks to get on his

20  feet and Snapp paid rent but did not have a key to the apartment. (*Id.* at 45-46, 98-100.)

21  Snapp stayed longer than expected, and at the beginning of November, Bobby Wood told

22

23      [2]The Court granted (1) Respondents' motion to dismiss grounds 4, 5, and 10 as
24  unexhausted and (2) Petitioner's motion to dismiss the unexhausted portions of grounds
   1, 3, 7 and 11. (ECF Nos. 77, 80.)

25      [3]The Court summarizes the relevant state court record for consideration of the
26  issues in the case. The Court makes no credibility findings or other factual findings
   regarding the truth or falsity of evidence or statements of fact in the state court. The Court
27  summarizes the same solely as background to the issues presented in this case. No
   assertion of fact made in describing statements, testimony, or other evidence in the state
28  court constitutes a finding by this Court. Any absence of mention of a specific piece of
   evidence or category of evidence does not signify the Court overlooked the evidence in
   considering the claims.

1   him he could stay only one more week. (*Id.* at 46, 113-14.) At about 4:30 p.m. on

2   November 8, 2005, Snapp asked Bobby Wood if he might stay another week, but Bobby

3   Wood told him he had to leave. (*Id.* at 46-48, 114.) Bobby Wood said Snapp was

4   "bummed" but "all right" and mentioned getting a motel. (*Id.* at 48.)

5           **B.      Snapp is kicked out of the apartment.**

6           Billy Wood testified that Bobby Wood, Snapp, and neighbor Alexi Chapman

7   Capsoff visited at the apartment after 8:00 p.m. on November 8, 2005. (ECF No. 17-1 at

8   196–97, 211–12.) Billy Wood said Snapp was drinking alcohol and Capsoff testified

9   Snapp was normally passive when intoxicated, but that night he was "[s]lurring his words,"

10  could not stand straight, and "wasn't himself." (ECF Nos. 17-1 at 212-13; 17-2 at 7-8, 10-

11  12, 37-38.)

12          Bobby Wood offered to take Capsoff out to play pool and Snapp interjected

13  "[W]hat, you guys f'ing now?" (ECF No. 17-2 at 50.) Capsoff said Snapp came up to her,

14  hugged her from behind, put his hand underneath her bra, and then placed his hands on

15  her face as if he would "snap" her neck. (*Id.* at 13-14.) Bobby Wood ordered Snapp out.

16  (*Id.* at 50-51.) Billy Wood told Snapp "You ain't doing that here," and Snapp left saying,

17  "Let's see someone try to stop me." (ECF No. 17-1 at 213–15.)

18          Bobby Wood followed Snapp outside, calmed him down, and everything seemed

19  alright, until Capsoff came outside, yelled, "No one treats me like this," and Snapp

20  responded by getting in Capsoff's face. (ECF No. 17-2 at 51-53.) Capsoff said she pushed

21  Snapp, and he pushed her back and slammed himself against her, thereby slamming her

22  against a wall. (*Id.* at 15-16.) Capsoff said another neighbor, Megan Borbo, got between

23  them but Snapp slammed Borbo into Capsoff, causing Capsoff to fall down. (*Id.* at 8-9,

24  16.)

25          Billy Wood went outside and broke up the argument. (ECF No. 17-1 at 215-16.)

26  Capsoff said Snapp threw a glass bottle at her and Borbo and threatened to return and

27  "kill" her and "get everybody else" before he left in his car. (ECF No. 17-2 at 17-18.) Bobby

28  Wood told Snapp "Just go and don't come back" and Snapp replied, "I'm gonna come

1   back and kill you mother f'ers." (*Id.* at 53.) Billy Wood also told Snapp "Get out of here,

2   don't ever come back," and Snapp replied "I'll be back and I'll [sic] gonna kill all of you."

3   (ECF No. 17-1 at 215-16.) Neighbors summoned police, but no one filed a report. (ECF

4   No. 17-2 at 18.)

5           **C.      Snapp asks Ruiz, Camacho, and Marquez for help.**

6           Crysta Oliver testified that on the night of November 8, 2005, she was sharing an

7   apartment in Reno, Nevada, with (1) Ruiz, her boyfriend; (2) Marquez and his sister,

8   Enlinda Marquez, their roommates; and (3) Camacho, who was a guest. (ECF No. 17-2

9   at 131-32, 134-37.) Oliver said Snapp and Ruiz were friends and Snapp arrived at the

10  apartment very upset that evening. (*Id.* at 139-40, 142-44.) Oliver heard Snapp say he

11  had been in a fight and his two best friends turned on him, kicked him out, and would not

12  allow him to retrieve his possessions from the apartment. (*Id.* at 144.) She heard Snapp

13  ask Ruiz to drive him to the apartment to get his property, "fight with them," get them back,

14  and do something about the situation. (*Id.* at 144, 148-149.) She also overheard Snapp

15  tell other men in the apartment about a safe with marijuana in it. (*Id.* at 154-55.)

16          Enlinda Marquez testified she was in the apartment that night and heard Marquez

17  ask Camacho to go with him to help Snapp "get this [sic] stuff out of the apartment"

18  because Snapp was "kicked out or something." (ECF No. 17-4 at 39-40, 49, 53.) Enlinda

19  Marquez did not hear anything about stealing. (*Id.*) She heard Camacho say, "No, I'm not

20  gonna go, it's not worth it," but Marquez said he was going, and Camacho changed his

21  mind and went with him. (*Id.* at 54.)

22          **D.      Snapp returns to the apartment with Marquez, Camacho, and Ruiz.**

23          Billy Wood testified he and Lowe were inside the apartment sometime after 9:40

24  p.m. when they heard a knock at the door. (ECF No. 17-1 at 217-19.) Billy Wood

25  answered the door, saw Snapp, Marquez, and Camacho, and without a word, they kicked

26  in the door, knocked Billy Wood to the ground, and immediately started beating him. (*Id.*

27  at 218-21, 235, 246.) Snapp came through the door and was the first to strike Billy Wood

28  on the head with a "claw hammer" followed by Marquez and Camacho who each hit him

4

in the head with baseball bats. (*Id.* at 222-24, 294.) Billy Wood was stabbed but did not know when or by whom. (*Id.* at 266.) Camacho continued to hit Billy Wood on the head with a baseball bat while Snapp and Marquez went for Lowe, and Billy Wood said he heard Lowe scream, "Brian, why are you killing me? Guys, why are you killing me?" and begging for his life. (*Id.* at 221-23, 233.)

Billy Wood managed to get into Bobby Wood's bedroom and held the door closed with his foot while someone beat holes in the door. (*Id.* at 224-25, 232-34.) With his foot holding the door shut, Billy Wood grabbed a "really long" weight-lifting bar, bashed the window out, and screamed, "Call the cops, call the cops," and then tried to scare the assailants away by yelling, "The cops are here." (*Id.* at 224-25, 240.)

Bobby Wood and Capsoff, who were upstairs at Borbo's apartment, heard a loud noise and the sound of fighting coming from the apartment downstairs, and knew something was wrong. (ECF No. 17-2 at 18-19, 57-58.) Bobby Wood grabbed a baseball bat and he and Capsoff ran downstairs to his apartment, but the door was locked. (*Id.* at 19-20, 58.) Bobby Wood used his key, went inside, and someone locked the door so Capsoff could not open it. (*Id.* 21, 58.) Bobby Wood saw Snapp and "those guys" standing over Lowe, so he hit Snapp, but then Marquez hit Bobby Wood, and the two struggled back and forth until Bobby Wood was hit from all directions and lost consciousness. (*Id.* at 59-60, 64-69.)

Billy Wood testified he looked out from Bobby Wood's bedroom and saw Snapp beating Bobby Wood against the refrigerator with a claw hammer. (ECF No. 17-1 at 224.) Billy Wood ventured out, and Camacho swung a baseball bat at him, but Billy Wood blocked it, hit Camacho in the side, and Camacho ran out of the apartment. (*Id.* at 224-25, 234.) Billy Wood then saw Marquez watching Lowe, who was bleeding from a chest wound, and swung the weight-lifting bar at Marquez, but Marquez caught it, and the two struggled until Marquez ran out of the apartment. (*Id.* at 225-26, 234, 256, 299-300.) Billy Wood saw Lowe go into Bobby Wood's bedroom, and then Billy Wood walked behind Snapp, who was beating Bobby Wood's head with the hammer by the refrigerator, took

the hammer out of Snapp's hand, hit Snapp in the head with it, chased Snapp outside the apartment, and threw the hammer at him. (*Id.* at 227-28, 234, 247, 254.) Billy Wood said he ran back into the apartment, tried to stop Lowe's bleeding, covered Bobby Wood's bleeding ear, called his mother and told her, "We're all bleeding, we're all dying, you know, call the cops," and then heard sirens. (*Id.* at 228.)

Billy Wood never heard anyone demand any property, clothes, the safe, the key to the safe, or money, and nothing was taken from the house. (*Id.* at 295-96.) Billy Wood was stabbed, sustained a bleeding head, and had a "hole" in his arm. (*Id.* at 258.) He did not see anyone stab anyone with a knife and did not see Marquez holding a knife, but there was a knife on the kitchen counter. (*Id.* at 268, 293.) The paramedics later informed Billy Wood that Lowe died. (*Id.* at 229.) Bobby Wood returned to consciousness in the hospital and suffered a broken jaw, broken teeth, an injured shoulder, and forever lost hearing in his left ear. (ECF No. 17-2 at 60-61, 71-74.) Bobby Wood said no one had demanded money in his safe. (*Id.* at 108.) Enlinda Marquez testified that when Snapp returned to her apartment that night, she heard him say he "stabbed one of them." (ECF No. 17-4 at 56.)

Forensic Pathologist, Ellen Clark, testified Lowe bled to death from two chest stab wounds. (ECF No. 17-3 at 113-16, 129.) He was stabbed with a single-edge knife with a "fairly long blade" consistent with the kitchen knife recovered from the apartment. (*Id.* at 118-19, 123-24, 129.) She said a baseball bat and hammer could have inflicted Lowe's blunt trauma wounds to his head and elsewhere. (*Id.* at 124-29.)

**E.    Investigation**

Reno Police Department Detective Ron Chalmers testified Marquez was cooperative and he admitted he entered the apartment with a metal baseball bat and was involved in the attack. (ECF No. 17-2 at 233-37, 239.) According to Chalmers, Marquez said he entered the apartment as back up for somebody to get some property back and to obtain "money from a safe that did not belong to him." (*Id.* at 239, 252.) Chalmers testified Marquez denied taking property from the apartment and denied possessing a

1   knife or stabbing anyone. (*Id.* at 250-51, 253.) Marquez consented to collection of his

2   DNA and clothing. (*Id.* at 246-47.) Renee Romero, a supervising criminalist with the

3   Sheriff's office, testified she detected Lowe's DNA in blood found on Marquez's shoe.

4   (ECF Nos. 17-3 at 46-50, 89-90; 17-4 at 9, 26, 35-36.)

5   Chalmers testified Camacho likewise admitted he went into the apartment with a

6   wooden baseball bat, and although he attempted to strike an individual with the bat, the

7   individual ducked, and the bat struck a wall and fractured into pieces. (*Id.* at 243-44.)

8   Camacho said he struck a bedroom door with his bat after one individual locked himself

9   in that room. (*Id.* at 244-45.) Camacho told Chalmers he entered the apartment for a

10  couple of reasons, including to take money that "did not belong to him." (*Id.* at 245.)

11  Reno Police Detective David Phillip Jenkins testified Snapp acknowledged he was

12  involved in the attack at the apartment, but forgot what he took with him, and said it might

13  have been a "stick or club." (*Id.* at 271, 280-82.) Jenkins said Snapp talked about "having

14  a disagreement earlier in the evening and being disrespected and that he believed the

15  victims were in possession of money and drugs in a safe inside the apartment." (*Id.* at

16  282-84.) Jenkins said Snapp told him he went back "to kick some ass and get the money

17  and the drugs out of the safe." (*Id.* at 284.)

18  **III.   LEGAL STANDARDS**

19  Although the following legal standards are applicable to all Marquez's stated

20  grounds for relief, additional legal information specific to each ground accompanies the

21  Court's analysis.

22  **A.     Antiterrorism and Effective Death Penalty Act ("AEDPA")**

23  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a

24  federal court may not grant a petition for a writ of habeas corpus on any claim that was

25  adjudicated on the merits in state court unless the state court decision was contrary to,

26  or involved an unreasonable application of, clearly established federal law as determined

27  by United States Supreme Court precedent, or was based on an unreasonable

28

7

determination of the facts in light of the evidence presented in the state-court proceeding. *See* 28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10, 412) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "[t]hat even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult-to-meet" and "highly deferential standard for evaluating state-court rulings, which demands state-court decisions be given the benefit of the doubt." (internal quotation marks and citations omitted)).

///

Where there is no clearly established federal law—for example, when there is no holding from the Supreme Court stating a particular standard or rule at the time of the state court decision—then, by definition, a petitioner cannot establish under AEDPA that the state court's decision was either contrary to or an unreasonable application of clearly established federal law. *See, e.g.*, *Carey v. Musladin*, 549 U.S. 70, 76-77 (2006); *see also Williams,* 529 U.S. at 390, 412 (interpreting "[t]he meaning of the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States'" contained in 28 U.S.C. § 2254(d)(1) as referring to "the holdings, as opposed to the *dicta*, of the [Supreme] Court's decisions as of the time of the time of the relevant state-court decision"). A state court need not cite Supreme Court cases nor even be aware of Supreme Court cases so long as neither the reasoning nor the result of the state-court decision contradicts them. *See Early v. Packer*, 537 U.S. 3, 8, (2003).

### B.   Effective Assistance of Counsel

To successfully claim ineffective assistance of counsel, a petitioner must demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt v. Titlow*, 571 U.S. 12, 24 (2013). In considering an ineffective assistance of counsel claim, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689 (citation omitted). On the performance prong, the issue is not what counsel might have done differently but whether counsel's decisions were reasonable from his or her perspective at the time. *See id.* at 689-90. A petitioner making an ineffective assistance claim "must identify the acts or omissions of counsel

that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. In considering such claims, a court is obligated to "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* Under *Strickland*, strategic choices made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* On the other hand, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. It is the petitioner's burden to show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" *See Richter,* 562 U.S at 105 (internal citations omitted); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'") (citing *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003)).

## IV.   DISCUSSION

The Court addresses Marquez's grounds for requested relief in order below.

### A.   Ground 1—Admission of Marquez's Statement to Police

Marquez alleges the state district court improperly admitted his statements to police following inadequate warnings as required by *Miranda v. Arizona*, 384 U.S. 436 (1966), in violation of the Fifth and Fourteenth Amendments. (ECF No. 14 at 17-19.)

///

///

///

///

1

### 1.   Additional Background[4]

2       At trial, Detective Chalmers testified he conducted a traffic stop of Marquez's

3   vehicle and told Marquez that police had another person in custody and Chalmers wished

4   to obtain Marquez's "side of the story." (ECF No. 17-2 at 222-24.) Marquez consented to

5   a search of his vehicle and agreed to go to the police station to talk with Chalmers. (*Id.* at

6   224, 228.) Marquez was neither arrested nor handcuffed. (*Id.* at 223-24.) Chalmers and

7   Detective Colby Palmer transported Marquez to the Reno Police Department in an

8   unmarked police vehicle, but first stopped at Enlinda Marquez's vehicle where police had

9   detained Camacho and found the metal baseball bat. (*Id.* at 224-30.) Chalmers

10  subsequently took Marquez to an interview room at the police station and offered him

11  refreshments and the use of the restroom. (*Id.* at 233.) Chalmers, Marquez, and Palmer

12  were the only individuals present in the interview room. (*Id.*)

13      Chalmers testified that although Marquez was not arrested at the time, he gave

14  Marquez "a simple version of the *Miranda* rights" from memory. (*Id.* at 234.) Chalmers

15  told Marquez (1) he had the right to remain silent and explained that meant it was

16  Marquez's decision whether to speak with Chalmers and that Marquez could not be

17  forced to talk with him; (2) the information Marquez provided "would be documented in

18  [Chalmers's] police report" and reviewed by the District Attorney; (3) "nothing [Marquez]

19  told [him] would be off the record, that everything he told [him] would be on the record;"

20  and (4) he had a right to an attorney and if he could not afford one, but desired one, "the

21

22

23      [4]The record reflects Marquez's trial counsel did not move to suppress Marquez's
    statements or object to trial testimony about Marquez's interview statements to police.
24  (ECF Nos. 17-2 at 213–60; 34-25 at 4.) The state district court and jury were not
    presented with the video tape or transcript of Marquez's interview statement with police.
25  (ECF No. 87-7.) Instead, the state district court admitted only Detective Chalmers's trial
    testimony concerning his *Miranda* warnings and some of Marquez statements. (ECF No.
26  17-2 at 213–60.) As such, the Nevad Supreme Court's adjudication of this claim on direct
    appeal was necessarily based on Chalmers's trial testimony. Although reliance on the
27  transcript of Marquez's statement to police is appropriate for review of the ineffective
    assistance of counsel claim in ground 6 because the transcript and video tape were
28  considered at the postconviction evidentiary hearing, only Chalmers's trial testimony is
    considered for ground 1. *See, infra*, n.14.

11

1   courts would appoint an attorney to represent him for any questioning." (*Id.*) Chalmers

2   asked if Marquez understood his rights and Marquez said, "Yes." (*Id.*)

3         At trial, Enlinda Marquez testified Marquez was 20 years old and completed only

4   the ninth or tenth grade. (ECF No. 17-4 at 39-40, 45-46.) The Pretrial Service

5   Assessment, dated December 23, 2005, revealed Marquez had no prior criminal record.

6   (ECF No. 96-1 at 1.)

7         The record reflects the state district court did not determine the voluntariness of

8   Marquez's statements and instead instructed the jury to determine whether statements of

9   the defendants were "confessions, admissions or neither." (ECF No. 18 at 16.) The court

10  further instructed that if the jury determined a statement was a confession, it must

11  determine whether it was voluntarily made by considering "the effect of the totality of the

12  circumstances on the will of the defendant." (*Id.*) In making that determination, the court

13  instructed the jury it may consider "the youth of the accused" and "lack of education." (*Id.*)

14  Finally, the court instructed that if the jury determined a statement was not voluntary, it

15  may not consider it for any purpose. (*Id.*)

16          **2.**   ***Miranda* Warning Legal Standard**

17        In *Miranda v. Arizona,* the Supreme Court held "the prosecution may not use

18  statements, whether exculpatory or inculpatory, stemming from custodial interrogation of

19  the defendant unless it demonstrates the use of procedural safeguards effective to secure

20  the privilege against self-incrimination." 384 U.S. 436, 444 (1966).[5] The Court held, "at

21  the outset, if a person in custody is subject to interrogation," he must be warned "in clear

22  and unequivocal terms" prior to questioning that (1) he has a right to remain silent; (2)

23  any statement he does make may be used as evidence against him in a court of law; and

24  (3) he has the right to the presence of an attorney, either retained or appointed. *Id.* at

25  444-45, 467-79.

26  ///

27

28       [5]In *Miranda*, the Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444.

The second required warning "[i]s needed in order to make [a suspect] aware not only of the [Fifth Amendment] privilege, but also of the consequences of forgoing it." *Id.* at 469. "It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege." *Id.* The Court further explained, "[t]his warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest." *Id.*

"The warnings required and the waiver necessary in accordance with [the *Miranda*] opinion . . . are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant." *Id.* at 476; *see also California v. Prysock*, 453 U.S. 355, 359 (1981) (noting "*Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures."). In *Duckworth v. Eagan*, the Supreme Court stated reviewing courts "need not examine *Miranda* warnings as if construing a will or defining the terms of an easement," rather, "[t]he inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" 492 U.S. 195, 202-03 (1989) (quoting *Prysock,* 453 U.S. at 361.)

"Once [the *Miranda*] warnings have been given," "[i]f the individual indicates in any manner, at any time prior to or during questioning," a wish "to remain silent or consult an attorney, the interrogation must cease" and "[a]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Miranda,* 384 U.S. at 473-74. On the other hand, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.'" *Id.* at 475 (citing *Escobedo v. Illinois*, 378 U.S. 478, 490 n.14 (1964)).

A person may waive his or her *Miranda* rights provided that the waiver is knowing, voluntary, and intelligent. *See Miranda*, 384 U.S. at 479; *see also North Carolina v. Butler*, 441 U.S. 369, 373-76 (1979). The totality of circumstances approach is the

1    standard used for adults and juveniles in determining whether a *Miranda* waiver was

2    knowing, intelligent, and voluntary. *See Fare v. Michael C.*, 442 U.S. 707, 723 (1970).

3        In *Jackson v. Denno,* the Supreme Court held a defendant is entitled to a state

4    court hearing on the voluntariness of his confession by a body other than the one trying

5    his guilt or innocence. 378 U.S. 368, 376-391 (1963). In that case, the Court struck down

6    trial court instructions directing the jury to determine whether a defendant's confession

7    was voluntary, and if not, to disregard it and determine guilt or innocence solely from the

8    other evidence in the case. *See id.* at 374-75 n.5. The Court held this was a violation of

9    due process and reversed and remanded to the state court for an evidentiary hearing to

10   determine whether the confession the jury heard at trial was voluntary. *See id.* at 393-94.

11   If so, the Court stated no new trial was warranted. *See id.* at 394.

12       In *United States v. Tillman*, the Sixth Circuit Court of Appeals found *Miranda*

13   warnings constitutionally deficient because the requisite warning that the suspect's

14   statements could be used against him was omitted. 963 F.2d 137, 140 (6th Cir. 1992). In

15   reversing the denial of a motion to suppress, the Sixth Circuit noted, "[o]f all of the

16   elements provided for in *Miranda*, this element [that any statements made can be used

17   against a defendant] is perhaps the most critical because it lies at the heart of the need

18   to protect a citizen's Fifth Amendment rights." *Id.* at 141. On the other hand, in *United*

19   *States v. Frankson,* the Fourth Circuit upheld a warning that anything Frankson said could

20   be used against him, even though the warning omitted the fact that his statements could

21   be used against him "in court," because the warning "unequivocally conveyed that *all* of

22   Frankson's statements could be used against him anytime, anywhere, including a court

23   of law," rendering it "a broader warning than *Miranda* actually requires." 83 F.3d 79, 82

24   (4th Cir. 1996).

25       **3.      The Nevada Supreme Court's Determination**

26       The Nevada Supreme Court denied this claim on direct appeal as follows.

27       Admission of Marquez's statements to the police

28           Marquez first contends that the district court erred in allowing the
         State to present testimony regarding his confession to Officer Chalmers.

14

Marquez did not file a pretrial motion to suppress, nor did he object to admission of his statement at trial. Failure to object at the trial court level precludes appellate consideration of an issue, unless the defendant demonstrates plain error affecting his substantial rights.

> [FN 2] Flores v. State, 121 Nev. 706, 722, 120 P.3d 1170, 1180-81 (2005).

Because Marquez did not object to admission of his confession to the police either before or at trial we review his assertion of error for "plain error."

> As established in Miranda v. Arizona,

> [FN 3] 384 U.S. 436 (1966).

the Fifth Amendment privilege against self incrimination provides that a suspect's statements made during a custodial interrogation are inadmissible at trial unless the police first provide a Miranda warning and the defendant makes a knowing waiver of his rights.

> [FN 4] State v. Taylor, 114 Nev. 1071, 1081, 968 P.2d 315, 323 (1998) (citing Miranda, 384 U.S. at 479).

For the purposes of Miranda, "custody" means a "formal arrest or restraint on freedom of movement."

> [FN 5] Casteel v. State, 122 Nev. 356, 361, 131 P.3d 1, 4 (2006) (internal quotations omitted).

If no formal arrest occurs, the relevant inquiry is whether a reasonable person in that situation would feel free to terminate the interrogation and leave.

> [FN 6] Id.

In Alward v. State, this court listed several factors relevant to determining whether an interrogation is custodial, including: "(1) the site of the interrogation, (2) whether the investigation has focused on the subject, (3) whether the objective indicia of arrest are present, and (4) the length and form of the questioning."

> [FN 7] 112 Nev. 141, 155, 912 P.2d 243, 252 (1996) overruled on other grounds by Rosky v. State, 121 Nev. 184, 111 P.3d 690 (2005).

> Here, the interview took place at the police department, and Marquez was taken to the police department in an unmarked police car. Marquez was a focus of the investigation, and the only people present in the interview room were Marquez and other police officers. Based on these facts, we conclude that the interview of Marquez was custodial.

> As indicated above, to admit the statements made during a custodial interrogation, the defendant must knowingly and voluntarily waive his Miranda rights.

15

[FN 8] Koger v. State, 117 Nev. 138, 141, 17 P.3d 428, 430 (2001).

Specifically, Miranda requires a person be warned that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."

[FN 9] 384 U.S. at 444.

In this case, Officer Chalmers stated that he did not read Marquez a full version of his Miranda rights. However, Officer Chalmers testified that he informed Marquez that he had the right to remain silent, that any information would be recorded in a police report and given to the district attorney, and that he had the right to consult with an attorney. Officer Chalmers did not inform Marquez that any statement he made could be used as evidence against him. After acknowledging that he understood these warnings, Marquez continued to speak with Officer Chalmers, and described his involvement in the attack.

We conclude that by informing Marquez that any statements he made would be documented in a police report, rather than warning Marquez that any statement he made could be used as evidence against him, Officer Chalmers did not technically comply with the requirements set forth in Miranda. We further conclude, however, that any error resulting from admission of Marquez's statement to Officer Chalmers does not rise to the level of plain error requiring reversal.

[FN 10] We have also reviewed Marquez's claim that he should have been warned in Spanish and conclude that this claim lacks merit, as it appears that Marquez speaks and understands English.

First, Marquez's failure to file a timely suppression motion, or to otherwise object at trial, is indicative of an apparent tactical decision by trial counsel to waive the argument so that the statement could be used for defensive purposes so that Marquez would not have to testify and subject himself to cross-examination about his admitted participation in this affair. Second, under Ducksworth v. Egan, [sic]

[FN 11] 492 U.S. 195, 203 (1989).

it appears that the warnings actually given reasonably conveyed the rights afforded under Miranda.

(ECF No. 20 at 3-6.)

### 4.    Analysis

The Nevada Supreme Court's application of U.S. Supreme Court authority in

determining the *Miranda* warnings given to Marquez "reasonably conveyed the rights

1  afforded under *Miranda*," and therefore his statements were voluntary, knowing, and

2  intelligent, was objectively reasonable based on the record before that court.[6]

3     Chalmers testified he told Marquez (1) he had the right to remain silent; (2) he did

4  not have to speak with Chalmers; (3) he had the right to an attorney before questioning;

5  and (4) the court would appoint an attorney for questioning if Marquez desired but could

6  not afford one. Although Chalmers omitted the second warning required by *Miranda*—

7  that Marquez's statements to police could be used as evidence against him in court—the

8  warnings, in the context in which they were given, would put a reasonable person of

9  Marquez's age, experience, education, and English-language abilities, on notice that he

10 was not free to leave, and that his statements were gathered in contemplation of legal

11 proceedings against him. The warnings were made at the police station following a traffic

12 stop of Marquez's vehicle during which police asked to search Marquez's vehicle and told

13 him they wanted to hear his side of the story concerning the incident at the apartment.

14 Police also transported Marquez in their vehicle to the scene of Camacho's separate

15 traffic stop. Chalmers testified he told Marquez his statements were "on the record" and

16 would be given to the District Attorney in a police report and informed Marquez the court

17 would appoint an attorney for him if he could not afford one. Marquez told Chalmers he

18 understood those rights and nothing in the record shows Marquez expressed a desire to

19 speak with an attorney or halt the interrogation. There was also no basis to find Marquez

20 did not understand English or was intellectually incapable of comprehending the warnings

21 or the circumstances. Under the totality of these circumstances, the state supreme court

22 was not unreasonable in its conclusion that the warnings reasonably conveyed the rights

23 afforded under *Miranda*.

24    For the foregoing reasons, the Nevada Supreme court reasonably concluded the

25 warnings  substantially  conveyed  the  requisite  *Miranda*  warnings  and  Marquez's

26

27

_____

28    [6]Respondents did not challenge the Nevada Supreme Court's determination that Marquez was under custodial interrogation when he gave his incriminating statements to police. (ECF No. 90 at 5-8, 16-19.)

1   statements to police were voluntary, knowing, and intelligent. Therefore, Marquez is not

2   entitled to relief on Ground 1.[7]

3        **B.    Ground 2—Failure to Sever Defendants for Trial**

4        Marquez claims the state district court erroneously joined his trial with that of his

5   codefendants in violation of his rights to equal protection, due process, and a fair trial

6   under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 14 at 19-21.) He claims

7   that joinder was improper due to antagonistic defenses, spill over, and because it violated

8   his confrontation clause rights under *Bruton v. United States*, 391 U.S. 123 (1968). (*Id.*)

9   He further claims trial counsel's failure to sever his trial after Snapp discouraged Marquez

10  from testifying constituted ineffective assistance of counsel in violation of the Sixth and

11  Fourteenth Amendments. (*Id.*)

12       The Court subdivides these two claims. Ground 2(A) involves the state district

13  court's failure to sever the trials. Ground 2(B) involves ineffective assistance of counsel

14  for failing to move to sever. The Court addresses each in turn.

15            **1.    Ground 2(A)—Failure to Sever**

16       Ground 2(A) raises two questions: first, whether the trials were improperly joined,

17  and second, whether failing to sever the trials resulted in a *Bruton* violation.

18            **a.    Additional Background**

19       Snapp unsuccessfully moved to sever his trial, however, there is no record that

20  Marquez joined that motion.[8] (ECF Nos. 87-1; 20 at 6.) At trial, the state district court

21  instructed the jury not to use the statements of any defendant against any other

22

23       [7]Because the Court finds the Nevada Supreme Court reasonably concluded
    Marquez was subject to custodial interrogation, given adequate *Miranda* warnings, and
24  his statements were voluntary, the Court does not address the state district court's failure
    to determine the voluntariness of Marquez's statements to police. *See, e.g., Jackson*, 378
25  U.S. at 394.

26       [8]Respondents noted Marquez asserted in his state court direct appeal that he
    joined in Snapp's pretrial motion for severance and cited to supporting documents in his
27  supplemental appendix. (ECF No. 90 at 12 n. 3.) The Court is satisfied Respondents
    made best efforts to obtain the supplemental appendix from the state courts but found the
28  documents are no longer available. (*Id.*) Marquez's counsel for this proceeding submitted
    no documents evidencing Marquez joined in Snapp's severance motion.

defendant. For instance, when Oliver testified Ruiz told her that "[h]e didn't even have time to park," before "the other three guys" "jumped out" of the car, the court instructed the jury not to use Ruiz's statement against the other defendants. (ECF No.17-2 at 161-63.) When Detective Chalmers testified Marquez and Camacho each admitted taking baseball bats to the apartment intending to take money that did not belong to them, the court instructed the jury to consider Marquez's statements against Marquez, Camacho's statements against Camacho, and not to use their individual statements against any other defendant. (*Id.* at 235, 240, 260.) Likewise, when Detective Jenkins' testified that Snapp said he took a "stick or club" inside the apartment, believed the victims had money and drugs in a safe inside the apartment, and he intended to "to kick some ass and get the money and the drugs out of the safe," the court told the jury not to consider Snapp's statements in connection with the other defendants. (*Id.* at 279-80, 284.)

Before deliberations the state district court instructed the jury to consider "the case of each defendant" "separately and individually" and "[t]he fact that you may find one or more of the defendants guilty or not guilty of any of the crimes charged should not control your verdict as to any other crime or any other defendant." (ECF No. 18 at 13.) The court reminded the jury of its earlier instructions "that certain statements attributed to a particular defendant pertain only to such defendant" and directed the jury to "strictly follow this instruction" and during its deliberations it "may not consider or discuss any such statement" for any other defendant. (*Id.* at 17.)

In closing remarks Snapp's counsel argued the defendants went to the apartment to retrieve Snapp's belongings, and although Marquez and Camacho said they went to take money that did not belong to them, no one asked whether the money belonged to Snapp. (ECF No. 17-5 at 70.) Camacho's counsel argued there was no evidence of an agreement between Snapp, Marquez, Camacho, and Ruiz to kill anyone, or commit a robbery or burglary. (*Id.* at 100-02.) Ruiz's counsel emphasized the court's instructions directed the jury to consider each defendant individually with regard to each count, and argued there was no evidence Ruiz specifically intended the crimes of robbery, burglary,

1   or battery with a deadly weapon. (*Id.* at 105-06, 111-12.) Marquez's counsel argued

2   Marquez entered the apartment as back up while Snapp retrieved his property, and

3   Marquez did not intend to steal anything. (*Id.* at 88, 91.) Counsel argued Marquez was

4   guilty of battery with a deadly weapon (for counts 4 and 5) because he hit Bobby and Billy

5   Wood with the baseball bat, but Marquez was not guilty of first-degree murder. (*Id.* at 92.)

6   At the postconviction evidentiary hearing, Marquez's counsel did not recall Camacho,

7   Ruiz, and Marquez having adverse defenses. (ECF No. 22-5 at 33-34.)

8            **b.      The Nevada Supreme Court's Determination of Alleged**

9                     **Improper Joinder**

10  The Nevada Supreme Court denied this claim on direct appeal as follows.

11  Failure to sever

12          Marquez next argues that the district court erred in failing to sever
    his trial from that of Snapp, Camacho and Ruiz. Because Marquez did not
13  file a pretrial motion to sever or otherwise object at trial, we review this claim
    using the plain error standard.

14
          [FN 12] Flores v. State, 121 Nev. at 722, 120 P.3d at 1180-81
15        (stating that failure to object at trial generally precludes
          appellate consideration of an issue, unless the defendant
16        demonstrates plain error affecting his substantial rights).

17          The joinder of defendants is within the sound discretion of the district
    court, and this court will not reverse a district court decision to join or sever
18  claims absent an abuse of discretion.

19        [FN 13] Lisle v. State, 113 Nev. 679, 688, 941 P.2d 459, 466
          (1997).
20
    When considering whether to reverse a district court decision to join
21  defendants, this court "must consider not only the possible prejudice to the
    defendant but also the possible prejudice to the Government resulting from
22  two time-consuming, expensive and duplicitous trials."

23          [FN 14] Id. at 688-89, 941 P.2d at 466 (internal quotations
            omitted).
24
    Therefore, an appellant challenging a district court joinder decision bears a
25  "heavy burden" of showing that the district court abused its discretion.

26         [FN 15] Rowland v. State, 118 Nev. 31, 44, 39 P.3d 114, 122
           (2002).
27
    NRS 174.165 provides that
28

20

If it appears that a defendant or the State of Nevada is prejudiced by a joinder of offenses or of defendants in an indictment or information, or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

In interpreting NRS 174.165, this court has concluded that joinder is appropriate [sic] where (1) multiple defendants present antagonistic defenses, or (2) when evidence properly submitted against one defendant will "spill over" to another defendant, improperly influencing the way the jury views the other defendant.

[FN 16] Id. at 45, 39 P.3d at 122-23.

To sever trials due to antagonistic defenses, a defendant must show that the defenses presented by the co-defendants are "antagonistic to the point they are mutually exclusive."

[FN 17] Id. at 45, 39 P.3d at 122.

This court has adopted the rule of the Ninth Circuit that "defenses become 'mutually exclusive' when 'the core of the codefendant's defense is so irreconcilable with . . . the core of the defendant's own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the defendant.'"

[FN 18] Id. at 45, 39 P.3d at 123 (quoting United States v. Throckmorton, 87 F.3d 1069, 1072 (9th Cir. 1996)).

Marquez argues that his defense was antagonistic to Snapp and Ruiz's because he and Camacho "reluctantly" agreed to "back up" Snapp in retrieving his property from the apartment, while Snapp wanted to return to the apartment to get revenge, and possibly steal property. We disagree. At trial, Snapp never argued that he intended to seek revenge, or kill anyone. Rather, Snapp maintained that wanted [sic] to return to the apartment to retrieve property that belonged to him. Therefore, we conclude that severance was not warranted due to presentation of antagonistic defenses.

We also conclude that severance was not mandated under the "spillover" or "rub-off" theory. "The 'spillover' or 'rub-off' theory involves the question of whether a jury's unfavorable impression of one defendant against whom the evidence is properly admitted will influence the way the jurors view the other defendant."

[FN 19] Lisle, 113 Nev. at 689, 941 P.2d at 466 (internal quotations omitted).

However, severance is not appropriate if based solely on a theory of "guilt by association."

[FN 20 ] Id.

In addition, a defendant is not entitled to a severance "merely because the evidence admissible against a co-defendant is more damaging than that

admissible against the moving party," or because a defendant stands a better change at acquittal if tried separately.

[FN 21] Id. at 689-90, 941 P.2d at 466.

Here, Marquez points to several statements that he claims improperly spilled over against him. He notes that Ruiz's roommate offered a statement by Ruiz that when he got to the apartment complex, "the other three guys had jumped out before he even had time to park the car." He also points to an admission by Snapp to a police detective that he had a disagreement with his roommates earlier, and that he wanted to go back to the apartment to "kick some ass and get the money and the drugs out of the safe." Finally, he points to an admission by Camacho to the police that he was involved in the incident at the apartment, hit a person with a wooden bat, and wanted money that was not his own.

We conclude that none of these statements is so unfavorable or prejudicial that they improperly "spilled over" to Marquez. Rather, the statements align closely with Marquez's own admission that he entered the apartment with a baseball bat for the purposes of obtaining money that was not his own. As indicated above, the fact that a defendant would have a better chance of acquittal if tried separately does not, in itself, warrant severance. Thus, because Marquez has not demonstrated the presence of antagonistic defenses or prejudice due to spillover, we conclude that the district court did not abuse its discretion in failing to sua sponte order severance.

(ECF No. 20 at 6-9.)

### c.    Analysis of Improper Joinder

In *United States v. Lane*, the Supreme Court commented in a footnote that, "[i]mproper joinder does not, in itself, violate the Constitution[; r]ather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."[9] 474 U.S. 438, 446 n.8 (1986). In *Zafiro v. United States*, the Supreme Court subsequently held when defendants have been properly joined under Federal Rule of Criminal Procedure 8(b), a federal district court should grant a severance under Federal Rule of Criminal Procedure 14 only if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." 506 U.S. 534, 539 (1993). The Court pointed out that, while severance may be warranted

---

[9]The claims considered in *Lane* concerned severance under the Federal Rules of Criminal procedure and were not "of constitutional magnitude." *See* 474 U.S. at 442-50.

1
2
3

in certain instances, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* (quoting *Richardson v. Marsh*, 481 U.S. 200 at 211 (1987)).

4
5
6
7
8
9
10
11

Following the issuance of the remittitur for Marquez's direct appeal, the Ninth Circuit Court of Appeals determined the above statements in *Lane* and *Zafiro* were *obiter dictum* because those cases addressed only joinder under the Federal Rules of Criminal Procedure. *See Collins v. Runnels*, 603 F.3d 1127, 1131-32 (9th Cir. 2010). Because the Supreme Court had not addressed under what conditions failure to sever defendants in a state court trial rises to the level of a federal due process violation, the Ninth Circuit held there is no clearly established federal law for that issue within the meaning of 28 U.S.C. § 2254(d)(1). *See id.* at 1132-33.

12
13
14
15

As discussed above, where there is no clearly established federal law stating a particular standard or rule at the time of the state court decision, then, by definition, Marquez cannot establish under AEDPA that the state court's decision was either contrary to or an unreasonable application of clearly established federal law.

16
17

> **d.     The Nevada Supreme Court's Determination of the Alleged *Bruton* Violation**

18
19
20
21

Marquez relatedly alleges the state district court should have severed his trial because he was unable to cross-examine his codefendants about their confessions in violation of *Bruton*. (ECF Nos. 14 at 1-20; 19-3 at 15-21.) The Nevada Supreme Court rejected this claim as follows:

22

Bruton violations

23
24

   In addition to his claim that the district court erred in failing to sever his trial, Marques [sic] also argues that admission of certain statements by Snapp, Camacho and Ruiz violated his Sixth Amendment right to confrontation, as established in Bruton v. United States.

25

[FN 22] 391 U.S. 123.

26
27
28

In Bruton, the United States Supreme Court held that evidence of an incriminating statement by one defendant which expressly refers to the other defendant violates the Confrontation Clause of the Sixth Amendment, and a limiting instruction to the jury is not sufficient to overcome the resulting prejudice.

23

> [FN 23] Id. at 127-28; Ducksworth v. State, 114 Nev. 951, 953,
> 966 P.2d 165, 166 (1998).

> To fall within Bruton's protective rule, a statement by a codefendant
must facially or expressly implicate the defendant.

> [FN 24] Rodriguez v. State, 117 Nev. 800, 809, 32 P.3d 773,
> 779 (2001); McRoy v. State, 92 Nev. 758, 759, 557 P.2d 1151,
> 1152 (1976) (finding no Bruton violation when "the statements
> admitted at trial contained no direct references to [the
> defendant] and posed no substantial threat to his right to
> confrontation").

No Bruton violation occurs when a jury learns only that a codefendant made
a statement but is not told the specific contents of that statement.

> [FN 25] Hill v. State, 114 Nev. 169 [sic] 177, 953 P.2d 1077,
> 1083 (1998).

Similarly, statements that merely refer to the defendant's existence (such
as "me and another guy"), but do not reference the defendant by name, and
are incriminating only when linked with other evidence presented at trial,
may be admitted.

> [FN 26] Lisle v. State, 113 Nev. 679, 693, 941 P.2d 459, 468
> (1997) (finding no Bruton violation where codefendant's
> statement referred to the defendant as "the other guy") (citing
> Richardson v. Marsh, 481 U.S. 200, 211 (1987); United States
> v. Enriquez-Estrada, 999 F.2d 1355, 1359 (9th Cir. 1993)).

> Here, the district court read an appropriate limiting instruction prior
to each instance of testimony regarding incriminating statements by Snapp,
Camacho and Ruiz. No statement admitted against Snapp, Camacho or
Ruiz referenced Marquez by name. In fact, none of the statements admitted
against Snapp and Camacho mentioned the presence of any other
attackers. While the State also presented a statement by Ruiz that referred
to the presence of other perpetrators, Ruiz stated only that he drove three
"other guys" to the apartment, and when he got to the apartment complex,
"the other three guys had jumped out before he even had time to park the
car."

> As indicated above, statements referring merely to "the other guy,"
are not considered to implicate a defendant. Thus, while these statements
may have become incriminating when linked with evidence at trial, we
conclude that the district court did not violate Bruton in admitting testimony
related to the statements by Snapp, Camacho, or Ruiz.

(ECF No. 20 at 10-11.)

///

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### e.    Analysis of the Alleged *Bruton* Violation

Based on the authority at the relevant time, the Nevada Supreme Court's determination that Ruiz's statement did not violate *Bruton* constitutes an unreasonable application of U.S. Supreme Court authority.

In *Bruton,* defendants Evans and Bruton were tried jointly for robbery. 391 U.S. at 124. Evans did not testify, but a postal inspector testified that Evans verbally confessed he and Bruton committed the crime. *See id.* The trial court told the jury it was to consider Evans's confession as evidence against only Evans, and not Bruton. *See id.* at 125. The Supreme Court held, "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [Bruton's] guilt," admission of Evans's confession in the joint trial violated Bruton's rights of cross-examination secured by the Confrontation Clause of the Sixth Amendment. *Id.* at 126; *see also Cruz v. New York*, 481 U.S. 186 (1987).

The Supreme Court later decided *Bruton*'s protection did not preclude admission of a non-testifying co-defendant's confession where that confession omitted all reference to the codefendant and her existence. *See Richardson,* 481 U.S. 203, 208, 211. In *Richardson*, Marsh and her codefendant were jointly tried for murder. *See id.* at 203. Williams's confession indicated he and Kareem Martin (who was a fugitive at the time of trial) discussed the murder in the front seat of a car while traveling to the victim's house. *See id.* at 203-04 n.1. The confession omitted any reference to the existence of Marsh and the jury was instructed not to consider the confession against her. *See id.* at 203-04. Marsh, however, testified she was in the back seat of the car during the drive to the victim's house. *See id.* at 204. In context, the confession could have helped convince the jury that Marsh participated knowingly in the crime. *See id.* at 206. The Court held the redacted confession fell outside *Bruton*'s protection and was admissible (with appropriate limiting instructions) at the joint trial because, unlike the confession in *Bruton*, which "expressly implicat[ed]" Bruton as an accomplice, Williams's confession made no

1  reference to Marsh or her existence, thus requiring other evidence to incriminate Marsh.

2  *Id.* at 207-08.

3       Later, in *Gray v. Maryland*, the Supreme Court decided a nontestifying

4  codefendant's confession that replaced the defendant's name with the word "deleted" or

5  a blank space set off by commas, fell within *Bruton's* protection. *See* 523 U.S. 185, 188

6  (1998). Responding to the question "Who was in the group that beat Stacey?" the

7  redacted statement of a codefendant used the phrase, "Me, , and a few other guys." *Id.*

8  at 192. The state linked Gray to the omission in the redacted statement by asking whether

9  Gray was arrested on the basis of information in the statement as soon as the officer

10  finished reading it into evidence. *See id.* The Court concluded the redacted statement fell

11  within the class of statements protected by *Bruton* because, although it did not name

12  Gray, it "directly referred to the 'existence' of the nonconfessing defendant." *Id.* at 197.

13  The Supreme Court suggested the redacted statement might have fallen outside of

14  *Bruton*'s protection had the response read, "me and a few other guys." *Id.* at 196.

15       At Marquez's trial, the only codefendant statement that facially inculpated Marquez

16  came from the testimony of Ruiz's girlfriend, Oliver, who testified Ruiz told her, "[t]he other

17  three guys had jumped out before he even had time to park the car." (ECF No. 17-2 at

18  161). It was obvious, based on Oliver's surrounding testimony that "the three other guys"

19  included Marquez because the prosecutor asked Oliver to clarify whom she meant by "all

20  the guys," and she specifically named Marquez. (*Id.* at 157-64.) Ruiz's statement could

21  support a finding that Marquez was eager, and therefore had a specific intent, to go to

22  the apartment while armed with a baseball bat to do harm to the occupants. Oliver was

23  subject to cross-examination about Ruiz's statement, but Ruiz did not testify.

24       Based on the authority at the relevant time,[10] the determination that Ruiz's

25  statement did not violate *Bruton* was an unreasonable application of U.S. Supreme Court

26

27       [10]The Nevada Supreme Court decided these claims in Marquez's direct appeal in
   May of 2008. (ECF No. 20.) At that time, neither the United States Supreme Court nor the
28  Ninth Circuit Court of Appeals had considered whether *Bruton* protection extended to
   statements like Ruiz's statements to Oliver, which are considered nontestimonial under

1   authority. Ruiz's confessional statement did not utilize the nonidentifying reference to "a

2   few other guys" that *Gray* indicated might fall outside *Bruton*'s protection. Instead, Oliver

3   testified Ruiz referred to "*the* three other guys," and explained that Marquez was included

4   in that group. As such, the Nevada Supreme Court unreasonably concluded Ruiz's

5   statements were not directly incriminating and accusatory or that Marquez was not

6   entitled to *Bruton*'s protection as to Ruiz's statement.[11]

7           Despite that the Nevada Supreme Court's application of *Bruton* was unreasonable,

8   Marquez will not be able to obtain relief because the error was harmless. Because the

9   Nevada Supreme Court did not consider whether the admission of Ruiz's statement was

10  harmless error, the Court concludes, after *de novo* review, that the erroneous admission

11  of Ruiz's statement did not have a substantial and injurious effect on the determination of

12  the jury's verdict. *See Harrington v. California*, 395 U.S. 250 (1969) (holding *Bruton* error

13  subject to harmless error analysis). The state's individual case against Marquez was

14  strong absent Ruiz's statement implying Marquez's eagerness to rush to the apartment.

15  Billy testified Snapp, Marquez, and Camacho "kicked" in his door while holding weapons

16  and, without saying a word, Snapp came inside and hit him with a hammer and Marquez

17  immediately hit him on the head with his baseball bat. Marquez and Snapp then went for

18  Lowe while Camacho continued to hit Billy with his bat. Bobby testified that when he

19  entered the apartment, Marquez hit him with a bat and the two struggled until Bobby was

20  hit from all directions and lost consciousness. Marquez later confessed that he entered

21

22  *Crawford v. Washington*, 541 U.S. 36, 68 (2004). *See Lucero v. Holland*, 902 F.3d 979,

23  983, 988 (9th Cir. 2018) (holding *Bruton*'s protection does not extend to a nontestifying
    codefendant's statements to a third party, listing Circuit decisions dating as far back as

24  2009, and stating, "[e]very circuit court to consider the issue—most circuit courts in the
    federal system, but, until today, not ours—has concluded that *Bruton*'s rule now applies

25  only to testimonial out-of-court codefendant statements.").

26  [11]The Nevada Supreme Court relied on *Richardson*, 481 U.S. at 211 and *United
    States v. Enriquez-Estrada*, 999 F.2d 1355, 1359 (9th Cir. 1993). However, by the time

27  of the state supreme court's decision, *Gray* had clarified that substitution of a neutral
    pronoun or symbol in place of the defendant's name is not permissible if doing so

28  nonetheless incriminates the defendant, and *Enriquez–Estrada* was already overruled to
    the extent it suggested the contrary. *See United States v. Peterson*, 140 F.3d 819, 822
    (9th Cir. 1998).

1  the apartment with a baseball bat as "back up" to assist Snapp in collecting his belongings

2  and that he intended to take money that did not belong to him. Finally, Lowe's blood was

3  found on one of Marquez's shoes. Given the strength of the evidence, Ruiz's statement

4  implying Marquez exited the car before Ruiz could park it, did not have a substantial and

5  injurious effect on the verdict and would not have supplied grounds to sever Marquez's

6  trial.

7       For the foregoing reasons, Marquez is not entitled to federal habeas relief based

8  on any of his allegations in Ground 2(A).

9       **2.**     **Ground 2(B)—Failure to Move to Sever**

10       Marquez also articulates an ineffective assistance of counsel claim because

11  Counsel did not move to sever his trial from the other defendants'.

12       **a.**     **The Nevada Court of Appeals' Determination**

13       The Nevada Court of Appeals denied the claim that counsel was ineffective in

14  failing to move to sever Marquez's trial from that of his codefendant's as follows.

15       Appellant argues that the district court erred in denying his claims of
ineffective assistance of trial counsel raised in his March 11, 2009, petition.

16  To prove ineffective assistance of trial counsel, a petitioner must
demonstrate that counsel's performance was deficient in that it fell below

17  an objective standard of reasonableness, and resulting prejudice such that
there is a reasonable probability that, but for counsel's errors, the outcome
of the proceedings would have been different. *Strickland v. Washington*,

18  466 U.S. 668, 687-88 (1984); *Warden v. Lyons*, 100 Nev. 430, 432-33, 683

19  P.2d 504, 505 (1984) (adopting the test in *Strickland*). Both components of
the inquiry must be shown, *Strickland*, 466 U.S. at 697, and the petitioner

20  must demonstrate the underlying facts by a preponderance of the evidence.
*Means v. State*, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). We give

21  deference to the district court's factual findings if supported by substantial
evidence and not clearly erroneous but review the court's application of the

22  law to those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d
1164, 1166 (2005). To warrant an evidentiary hearing, a petitioner must

23  raise claims that are supported by specific allegations that are not belied by
the record, and if true, would entitled [sic] him to relief. *Hargrove v. State*,

24  100 Nev. 498, 502-03, 686 P.2d 222, 225 (1984).

25       [FN 1] We note that the district court concluded that appellant
had failed to demonstrate that he was entitled to an

26  evidentiary hearing regarding a number of his claims and
limited the issues discussed at the evidentiary hearing to

27  those that needed further development outside of the existing
record.

28  . . . .

[A]ppellant argues that his trial counsel was ineffective for failing to move to sever his trial from his codefendant's [sic]. Appellant asserts that the trials should have been severed because the defenses were antagonistic. Appellant fails to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. The claim that the defenses were antagonistic was considered on direct appeal under a plain error standard and the Nevada Supreme Court concluded that the defenses were not antagonistic. *See Marquez v. State*, Docket No. 48624 (Order of Affirmance, May 6, 2008). Moreover, appellant fails to demonstrate a reasonable probability of a different outcome had counsel moved to sever the trials as there was substantial evidence of appellant's guilt given his confession, the eyewitness testimony, and physical evidence linking appellant to the crime. Therefore, the district court did not err in denying his claim without considering it at the evidentiary hearing.

[A]ppellant argues that his trial counsel was ineffective for failing to move to sever his trial from his codefendant's [sic] trial after a codefendant told the other codefendants that they should all decline to testify at trial. Appellant fails to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. After the potentially threatening comment was made, the district court admonished each defendant regarding their right to testify and explained that they had to individually decide whether they should testify. Given the circumstances of the comment and the admonishment by the district court, appellant fails to demonstrate that objectively reasonable counsel would have moved to sever the trials. As there was substantial evidence of appellant's guilt presented at trial, appellant fails to demonstrate that there was a reasonable probability of a different outcome had counsel sought to sever the trials based on the challenged comment. *See* NRS 174.165(1); *Rodriguez v. State*, 117 Nev. 800, 808-09, 32 P.3d 773, 778-79 (2001). Therefore, the district court did not err in denying this claim without considering it at the evidentiary hearing.

(ECF No. 38-25 at 2-5.)

### b.    Analysis

The Nevada Court of Appeals reasonably applied *Strickland* when it concluded counsel's failure to move to sever Marquez's trial based on antagonistic defenses and "spill over" did not constitute deficient or prejudicial performance. The Nevada Supreme Court, as the final arbiter of state law, had previously concluded on direct appeal that Marquez's defense was not antagonistic to that of his codefendants and the statements of his co-defendants did not "spill-over" or "rub off" such that they cast an unduly prejudicial and unfavorable impression on Marquez. The record reflects that the defenses of the four defendants were aligned around the premise that they went to the apartment to collect Snapp's property. The Nevada Court of Appeals also reasonably concluded

counsel's failure to move to sever Marquez's trial based on a *Bruton* violation was neither deficient nor prejudicial as there was no reasonable probability the result of the proceedings would have been different had counsel done so. Finally, counsel's failure to move to sever Marquez's trial based on Snapp's alleged comment discouraging Marquez from testifying did not constitute deficient performance and there is no reasonable probability the result of the proceedings would have been different, had counsel done so, as discussed in Ground 3.

Because the Nevada Court of Appeals reasonably applied *Strickland* in determining counsel's failure to move to sever Marquez's trial was neither deficient nor prejudicial, Marquez is not entitled to federal habeas corpus relief for Ground 2(B).

### C.    Ground 3—Failure to Affirm a Waiver of the Right to Testify

Marquez claims the state district court denied him the right to testify on his own behalf and a fair trial in violation of due process under the Fifth and Fourteenth Amendments by failing to question him regarding Snapp's intimidation and whether it influenced his failure to testify on his own behalf. (ECF No. 14 at 21-22.)

#### 1.    Additional Background

At trial, the state district court addressed and admonished Marquez, and the other defendants, of their rights to testify or not testify, and further stated, "The decision as to whether or not to testify is yours alone to make and you should each consider that carefully after discussing it with or receiving the advice of your counsel." (ECF No. 17-3 at 121-22.) Marquez agreed that he understood the court's admonition. (*Id.* at 122.)

Defense counsel subsequently alerted the state district court that, during counsel's discussion with Marquez about the possibility of testifying, Snapp said something to influence Marquez's decision. (ECF No. 17-4 at 3-4.) Sheriff Deputy Ronald Mueller had observed the discussion and informed the court that Snapp "mentioned something to the effect of 'If one of us testifies, we all go down.'" (*Id.* at 4.) Mueller said he heard Ruiz ask something along the lines of "Don't you think you have dragged us in this far enough?" (*Id.*) Mueller heard the defendants bickering "back and forth about respect." (*Id.*) Mueller

30

1    thought Snapp attempted to intimidate the other defendants about testifying and this

2    caused the deputies to rearrange the transport of the defendants. (*Id.* at 4-5.) Camacho's

3    counsel said, "there was definitely some intimidation going on through body language

4    from Mr. Snapp" and counsel understood Snapp's words to mean, "if someone testifies,

5    someone is gonna get their respect, meaning something else later." (*Id.* at 6.)

6           The state district court immediately advised the defendants: (1) they each had the

7    right to testify; (2) they each had the privilege not to testify; (3) no one could comment

8    about their failure to testify; (4) the decision whether or not to testify belonged to each of

9    them alone; (5) the decision whether or not to testify was not made by their attorneys or

10   by anybody else; (6) they should each make their decision after conferring carefully and

11   thoroughly with counsel; and (7) the decision whether or not to testify and their

12   cooperation with their attorneys were "among the most important decisions" each of them

13   would make in their lives. (*Id.* at 6-7.)

14          The state district court further explained that "even though all of you and your

15   counsel are seated at the same table, there is no such thing in this case as a team

16   defense." (*Id.* at 7.) The court told the defendants that "[u]nder no circumstances should

17   the decision you make concerning whether or not to testify be influenced in any way by

18   the conduct or statements or any other defendant or any other person," except their

19   attorneys, and their "own conscience and decision in the case." (*Id.* at 7-8.) The court

20   asked the defendants if they each understood the court's advisement, and each

21   defendant responded "Yes, sir," except for Marquez; however, Marquez's counsel later

22   informed the court that Marquez "will not be testifying in this trial." (*Id.* at 8, 66-67.)

23                        **2.    Legal Standard**

24          A defendant in a criminal case has right to testify on his own behalf. *See Rock v.*

25   *Arkansas*, 483 U.S. 44, 49-53 (1987). The Ninth Circuit Court of Appeals has held a "trial

26   court 'has no duty to advise the defendant of his right to testify, nor is the court required

27   to ensure that an on-the-record waiver has occurred.'" *United States v. Joelson*, 7 F.3d

28   174, 177 (9th Cir. 1993) (quoting *United States v. Edwards*, 897 F.2d 445, 446 (9th Cir.

1   1980). "Although the ultimate decision whether to testify rests with the defendant, he is

2   presumed to assent to his attorney's tactical decision not to have him testify." *Id.* at 177

3   (citing *Edwards*, 897 F.2d at 446-47). "[I]f the defendant wants to testify, he can reject his

4   attorney's tactical decision by insisting on testifying, speaking to the court, or discharging

5   his lawyer." *Id.* (citing *Martinez*, 883 F.2d at 761.) "Thus, a defendant's waiver of the right

6   to testify may be inferred from the defendant's conduct and is presumed from the

7   defendant's failure to testify or notify the court of his desire to do so." *Id.*

8                    ### 3.    The Nevada Supreme Court's Determination

9           The Nevada Supreme Court rejected this claim as follows. "[W]e have also

10  considered Marquez's remaining arguments, including those related to . . . failure to find

11  a knowing waiver of Marquez's Fifth Amendment right to testify . . . and conclude that

12  none of these alleged errors deprived Marquez of a fair trial." (ECF No. 20 at 11-12) The

13  court further explained:

14          [W]e also reject Marquez's argument that potentially threatening comments
        by Snapp regarding Marquez's decision to testify violated his Fifth
15      Amendment rights, and that these threats created a requirement that the
        district court canvass any defendant who alleges that he was threatened by
16      a co-defendant. First, we have declined to adopt the minority viewpoint that
        a district court must conduct an on-record colloquy with each defendant to
17      establish a knowing and voluntary waiver of the right to testify. See Phillips
        v. State, 105 Nev. 631, 633, 782 P.2d 381, 382 (1989). Second, we also
18      reject the notion that such a colloquy is required if a district court learns of
        a potential threat regarding a defendant's decision to testify because such
19      a requirement would cede control over the trial to a co-defendant in a
        criminal case. In addition, we conclude that in this case, the admonishment
20      and warning given by the district court regarding the right to testify was
        sufficient to counter the effect of any threatening statements Snapp may
21      have previously made in connection with Marquez's decision to testify.

22  (*Id.* at 12 n.27.)

23                    ### 4.    Analysis

24          Marquez cites no clearly established federal law requiring a state trial court to

25  question a defendant about his motives for testifying or to inquire into whether a defendant

26  knowingly and intelligently waives his right to testify. As discussed, where there is no

27  clearly established federal law stating a particular standard or rule at the time of the state

28  court decision, then, by definition, a petitioner cannot establish under AEDPA that the

1    state court's decision was neither contrary to, nor an unreasonable application of, clearly

2    established federal law. Thus, Marquez is not entitled to federal habeas relief for Ground

3    3.

4         **D.    Ground 6—Failure to Move to Suppress Marquez's Statements Under**

5              ***Miranda***

6         Marquez claims trial counsel's failure to suppress his statements to police

7    as violative of *Miranda* denied him the rights to effective assistance of counsel, protection

8    against self-incrimination, equal protection, due process, and a fair trial, under the Fifth,

9    Sixth, and Fourteenth Amendments. (ECF No. 14 at 24-25.)

10             **1.    Additional Background**

11              **a.    *Miranda* Warnings in this Interview**

12        At around 10:00 p.m. on November 9, 2005, Detective Chalmers interviewed

13   Marquez in the presence of Detective Palmer at the Reno Police Department. (ECF No.

14   95 at 1.) At the outset, Chalmers asked Marquez if he needed to use the restroom and

15   noted Marquez had a Pepsi and "a pretty good whack on the eye," but Marquez replied,

16   "I'm all right." (*Id.* at 1, 3.) Chalmers told Marquez police arrested Snapp and would take

17   breaks to compare Snapp's story with Marquez's story. (*Id.* at 2-3.)

18        Chalmers told Marquez he did not have to talk to them, he has "certain rights," and

19   stated he did not place Marquez "in handcuffs" and did not "arrest" him. (*Id.* at 3.)

20   Chalmers told Marquez "I'm not thinking necessarily that you guys went over there with

21   the intention to kill any people over at that place but I don't know that until I have a chance

22   to talk to you." (*Id.*) Chalmers asked Marquez if he knew his rights, but Marquez's

23   response was "inaudible." (*Id.*) Chalmers proceeded to tell Marquez he had "the right to

24   remain silent," which he said meant Marquez did not have to talk to him or "say anything"

25   to him. (*Id.*) Chalmers told Marquez he had "the right to an attorney and have him present

26   before any questioning . . . and the right to consult an attorney." (*Id.*) Chalmers explained

27   that meant Marquez had "the right to consult an attorney, if you can't afford one we will

28   get you one without any cost to you what so ever [sic] before any questioning." (*Id.*)

1  Chalmers told Marquez, "[e]verything you say will be used against you which means can

2  [sic] be . . . it means everything that you tell me I'm going to write in my police report so

3  the District Attorney can see what your side of the story is." (*Id.*) Chalmers went on to

4  explain, "I am going to document it and say 'hey, this is off the record just between you

5  and me, what happened', everything you tell me I'm going to document in my police report

6  so that the District Attorney knows and sees that, all right." (*Id.*)

7      Chalmers then asked Marquez, "Do you understand all of that?" (*Id.*) Marquez

8  replied, "Yes." (*Id.*) Chalmers then asked Marquez, "Knowing that those are your rights

9  and you don't have to talk to me, that you have a right to an attorney, everything you say

10  is going to go into my police report, do you mind telling me your side of this?" (*Id.*) Marquez

11  then proceeded to answer police questions and incriminate himself. (*Id.*)

### b.    Postconviction Evidentiary Hearing

13      Chalmers testified at the state postconviction evidentiary hearing that Marquez

14  was taken to the police station in an unmarked police vehicle. (ECF No. 22-5 at 3, 9.) He

15  said Marquez's name had surfaced, and "he was a person of interest," but Chalmers did

16  not know all of the circumstances, and Marquez's role was unclear to him. (*Id.* at 9-10.)

17  Marquez was not handcuffed during the traffic stop or interview. (*Id.* at 8.)

18      Chalmers said he gave *Miranda* warnings to Marquez only "as a precaution"

19  because Marquez went to the police station "consensually, willingly, unhandcuffed," and

20  "[h]e was left in an interview room with the door standing open."[12] (*Id.* at 6.) Chalmers told

21  Marquez his statements "would be used against him" but did specifically inform Marquez

22  his statements would be used against him "as evidence" or "in court." (*Id.* at 5.) Chalmers

23  said he usually tells a suspect that "anything they tell me will be on the record," "it can be

24  used against them," and that he will write the statements in a police report for the District

25  Attorney. (*Id.*) Chalmers said he occasionally informs suspects they may exercise their

27  _____
28      [12]Chalmers testified the video tape of the interview shows the door to the interview room was open, and there was a period of time when the door was open and no one was inside the room with Marquez, although Chalmers and another detective were outside the room. (ECF No. 22-5 at 8-9.)

1  right to silence and terminate questioning any time during the interview. (*Id.* at 5-6.)

2  Chalmers did not consider reading the *Miranda* rights to Marquez in Spanish as Marquez

3  understood English and Chalmers saw no signs or symptoms that Marquez was impaired

4  by any substance. (*Id.* at 6-7.) Only Chalmers, Palmer, and Marquez were present in the

5  interview room. (*Id.* at 10.)

6      Marquez testified he was 20 years old at the time of the police interview and had

7  never been arrested—not even as a juvenile. (*Id.* at 14.) Spanish is his first language,

8  and although he was born in California, his parents moved him to Mexico when he was

9  one year old. (*Id.* at 15.) He moved back to the United States when he was in sixth grade

10  and entered ESL (English as a Second Language) class. (*Id.*) He had a ninth-grade

11  education level, had difficulty understanding things in school that were not solved by ESL

12  language training, and worked landscaping and warehouse jobs before he was arrested

13  in this case. (*Id.* at 15-16.)

14      Marquez testified he did not understand his statements to police would be used as

15  evidence against him in court. (*Id.* at 16.) Marquez "didn't know what the District Attorney

16  was" or what the District Attorney does with a report, and did not ask Chalmers to explain

17  the significance of a District Attorney because he was "coming off the drug" and "wasn't

18  going to ask him." (*Id.* at 16-18.) Marquez felt he had to talk to Chalmers to tell his side of

19  the story and did not realize he could stop the interview. (*Id.*) Marquez can converse in

20  English but has trouble understanding legal terms. (*Id.* at 17.) Marquez did not tell

21  Chalmers he was under the influence, or that he did not understand English, and did not

22  ask for a translator during their interview. (*Id.* at 19-20.) He said he understood "some" of

23  Chalmers's questions and answered them truthfully. (*Id.* at 20.) Marquez said he told his

24  trial attorney that he was under the influence of methamphetamine during his interview

25  with police. (*Id.* at 18-19.)

26      Marquez's trial counsel testified he reviewed the video tape of Marquez's interview

27  but "did not see a basis to seek a motion to suppress" as he believed the *Miranda* warning

28  was "adequate." (*Id.* at 21-22, 35.) Counsel "thought it was made clear in the interview

35

that what [Marquez] said could be used against him," and "that it would be part of the record that would be forwarded to the District Attorney." (*Id.* at 22.) Counsel believed Marquez "had a limited fund of knowledge based on his youth and his Hispanic heritage," and "[i]t was just assumed" he knew the District Attorney was the prosecuting entity. (*Id.* at 28-29.) Counsel said, "It seemed clear to me that he knew what the process was." (*Id.* at 29.) Counsel testified it was apparent to him that Marquez "spoke English fluently," Marquez never expressed a need for a translator, and none was used at trial. (*Id.* at 22, 32.) Counsel, however, believed, given Marquez's youth, he "may have had difficulty understanding the legal import of some of the concepts that were involved such as the District Attorney being the prosecuting entity." (*Id.* at 32.) Counsel believed he used Chalmers's testimony that he did not believe Marquez "went over there with the intent to kill anybody" to show Marquez's limited role. (*Id.* at 23.)

### 2.    The Nevada Court of Appeals' Determination

The Nevada Court of Appeals rejected this claim as follows.

> [A]ppellant argues that his trial counsel was ineffective for failing to move to suppress his confession due to an inadequate *Miranda* warning, and because appellant lacked the education, background, and experience to intelligently waive his rights. Appellant fails to demonstrate that his trial counsel's performance was deficient or that he was prejudiced.
>
> At the evidentiary hearing, counsel testified that he did not move to suppress the confession because he concluded such a motion would be meritless. Counsel testified that he reviewed appellant's interview and concluded that the *Miranda* warning was sufficient and that appellant understood the waiver of his rights. Counsel also testified that he wanted to use appellant's statement to the police during the trial and penalty proceedings to show that appellant did not act with an intent to kill the victim. Tactical decisions such as these "are virtually unchallengeable absence extraordinary circumstances," *Ford v. State*, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989), which appellant does not demonstrate. Given the surviving victims' identification of appellant and the discovery of the deceased victim's blood on appellant's shoe, appellant fails to demonstrate a reasonable probability of a different outcome at trial had counsel attempted to suppress the confession. Therefore, the district court did not err in denying this claim.

(ECF No. 38-25 at 2-4.)

///

///

### 3. Analysis

The Nevada Court of Appeals' application of *Strickland* in rejecting this claim was objectively reasonable. Counsel's determination that a motion to suppress the statements was meritless, was reasonable based on (1) the warnings given; (2) counsel's direct experience communicating with Marquez in English; (3) counsel's observation that Marquez "understood the process"; (4) the interrogation transcript, which revealed Marquez understood police questions (posed exclusively in English) and that Marquez responded to material questions in an appropriate fashion; and (5) Chalmers warned that anything Marquez said would be used against him. Based on counsel's knowledge at the time, counsel could reasonably determine the warnings substantially conveyed the requisite *Miranda* warnings and a motion to suppress was meritless.

Chalmers's suggestion at the outset of the interview that Marquez's statements would be conveyed to the District Attorney "off the record" arguably contradicted his warning that Marquez's statements would be used against him, or at least, obscured the reality that the warnings meant Marquez's statements could be used as evidence against him by the District Attorney in a court of law; and not just, as Chalmers put it, so the District Attorney could see Marquez's "side of the story," "off the record." However, given the quality of deference owed to the state appellate court's determination and to counsel's assessment that the warnings reasonably conveyed the requirements under *Miranda*, it was not unreasonable for the state appellate court to determine counsel's performance was neither deficient nor prejudicial.

Because the state appellate court reasonably applied *Strickland* to the record in its determination, Marquez is not entitled to federal habeas corpus relief for Ground 6.

### E. Ground 7—Failure to Request Mitigation Instruction at Sentencing

Marquez claims trial counsel's failure to request sentencing mitigation instructions denied him effective assistance of counsel, a fair trial, equal protection, and due process, in violation of the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 14 at 26-27.)

///

### 1.      Additional Background

#### a.      Trial

Following the jury's guilty verdicts, the state district court held a penalty phase hearing where the jury determined the appropriate sentence for Marquez's first-degree murder conviction. (ECF Nos. 17-5 at 142; 18-1.) Enlinda Marquez testified Marquez was 20 years old when the incident occurred, had no criminal history, and had never been in trouble—even as a juvenile. (ECF No. 18-1 at 26.) She further testified Marquez completed the ninth grade but did not finish high school. (*Id.*) Marquez's other sister, Gabriela Marquez, testified the incident was completely out of character for Marquez, that he's "a follower" and "he's a really kind person" who "would do anything for friendship." (*Id.* at 30-31.) Detective Chalmers testified Marquez was cooperative with police, told the truth, took responsibility for his actions, and Chalmers did not believe Marquez intended to kill anyone. (*Id.* at 32-35.) Chalmers said he did not know if Marquez had a criminal history. (*Id.* at 33.) Marquez personally told the jury he had no intention to hurt anybody when he went to the apartment and "didn't know this was going to happen." (*Id.* at 39-40.) He said he barely knew Snapp and took a baseball bat because he had enemies on the street and "didn't know" where he was going. (*Id.* at 40.) He asked the jury to "[p]lease give me a chance to at least parole out in 40 years." (*Id.*)

None of the defendants objected to the jury instructions concerning punishment. (ECF Nos. 18-1 at 36-38; 18-2.) The state district court instructed the jury to consider the evidence presented during trial and the penalty hearing in deciding the appropriate sentence and that "the case of each defendant should be considered separately and individually." (*Id.* at 8-9.) The court instructed "the arguments of counsel" would "endeavor to aid you to reach a proper verdict." (*Id.* at 10.)

Marquez's trial counsel argued Marquez's decision to go into that house with a baseball bat was the biggest mistake he made "in his short life." (*Id.* at 65.) He urged the jury to consider the dynamics, who had an agenda, "who influenced who[m]," and "who may have been easily led here." (*Id.*) Counsel emphasized Marquez's youth by arguing

Ruiz was 38 years old "and if you take my client's age and Mr. Camacho's age and put those together, that's 38 years." (*Id.*) He urged the jury to look at the involvement of each individual defendant. (*Id.* at 66.) He argued a sentence of 20 to 50 years, or a sentence of life with possibility of parole, was a "distinction without a difference," because either way, Marquez would serve 40 years before parole eligibility, and urged the jury to instead sentence Marquez to 20 to 50 years. (*Id.* at 65-66.)

**b.**     **Postconviction Evidentiary Hearing**

At the state postconviction evidentiary hearing, defense counsel testified he was familiar with mitigating circumstances instruction for death penalty cases. (ECF No. 22-5 at 24.) Counsel said other lawyers would "probably" ask for a mitigating circumstances instruction in a non-capital case, however, none of the attorneys in this case did so, he had never seen that done before, and he believed it was "a matter of argument." (*Id.* at 26-30.) Counsel said Marquez never told him he was high on methamphetamine during the crimes or during the interview with police, and "drugs were never mentioned by [Marquez] in his involvement in this case." (*Id.* at 24-25.) He said Marquez did "not at all" have a significant criminal history, and although Marquez was an accomplice to the murder, his role was relatively minor. (*Id.* at 25-26.) Counsel believed he argued those points but felony murder subjected Marquez to harsh penalties regardless of the mitigation circumstances listed in NRS § 200.035 (*Id.* at 26-27.) Counsel acknowledged that, for prison purposes, a sentence of 20 to 50 years was more favorable than life without parole. (*Id.* at 27-28.)

**2.**     **Legal Standard**

NRS § 200.035 states a sentence for murder of the first degree may be mitigated by any of the following circumstances: (1) defendant has no significant history of prior criminal activity; (2) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance; (3) the victim was a participant in, or consented to, defendant's criminal conduct; (4) defendant was an accomplice to a murder committed by another and defendant's participation was relatively minor; (5)

39

1   defendant acted under duress or under the domination of another person; (6) the youth

2   of the defendant at the time of the crime; and (7) any other mitigating circumstance.

3                    **3.      The Nevada Court of Appeals' Determination**

4           The Nevada Court of Appeals rejected this claim as follows.

5           [A]ppellant argues that his trial counsel was ineffective for failing to request
            an instruction on mitigation evidence during the penalty hearing. Appellant
6           fails to demonstrate that his trial counsel's performance was deficient or that
            he was prejudiced. The district court instructed the jury to consider the
7           evidence presented at trial and during the penalty hearing. *See Lisle v.*
            *State*, 113 Nev. 540, 558, 937 P.2d 473, 484 (1997) ("There is a
8           presumption that jurors follow jury instructions."). Appellant fails to
            demonstrate it was objectively unreasonable for counsel to fail to request
9           an additional instruction specifically regarding mitigation evidence.
            Appellant fails to demonstrate a reasonable probability of a different
10          outcome at the penalty hearing had such an instruction been requested.
            Therefore, the district court did not err in denying this claim.

11

12   (ECF No. 38-25 at 6.)

13                   **4.      Analysis**

14          The Nevada Court of Appeals reasonably applied *Strickland* in determining

15   counsel did not perform deficiently by failing to request an instruction for the jury to

16   consider the mitigation criteria set forth in NRS § 200.035. None of the other attorneys in

17   this case requested a mitigation instruction and Marquez's counsel had never seen it

18   done before, except in capital cases. Marquez failed to establish that requesting the

19   instruction is a prevailing professional norm in noncapital cases in Nevada. Thus,

20   counsel's failure to request the instruction did not fall below an objective standard of

21   reasonableness.

22          The court also reasonably determined there was no reasonable probability the

23   result of the proceedings would have been different had counsel requested an instruction

24   on the statutory mitigation factors. The state district court instructed the jury that counsel's

25   argument would aid the jury in its decision on sentencing for the first-degree murder

26   conviction and Marquez's counsel presented testimony and argument supporting a 50-

27   year term sentence based on (1) youth; (2) lack of education; (3) lesser role; (4) lack of

28   criminal history; (5) influence of older individuals; (6) lack of intent to kill or harm anyone

                                              40

1    when he went into the apartment; (7) acceptance of responsibility; and (8) remorse.

2    Marquez's counsel did not argue Marquez was under the influence of methamphetamine

3    at the time of the offense because he was unaware of that fact. Counsel's mitigation

4    arguments thus incorporated the applicable NRS § 200.035 factors.

5         Because the state appellate court's application of *Strickland* was objectively

6    reasonable, Marquez is not entitled to federal habeas corpus relief for Ground 7.

7         **F.    Ground 8—Failure to Object to Victim-Impact Statements**

8         Marquez contends trial counsel's failure to object to the victim impact statements

9    at sentencing denied him effective assistance of counsel, equal protection, due process,

10   and a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (ECF No. 14

11   at 28-29.)

12        **1.    Additional Background**

13        At the penalty hearing for the first-degree murder conviction, Lowe's aunt,  Ruthy

14   Marie Sawyer, testified the defendants "all should get life." (ECF No. 18-1 at 6.) Lowe's

15   mother, Linda Coursey, told the defendants in her testimony, "[I] don't think you should

16   get out, not for 30 months, not for 50 years, not for a hundred years. I don't care if you

17   get the death penalty, that would tickle me to death, but you're not, I know this." (*Id.* at

18   12-13.) She went on to say, "There's compassionate people [sic] out there and you guys

19   are going to get very lucky. That's the way I feel. You're not—they're not going to pay

20   hard enough, they're not." (*Id.* at 13.)

21        Lowe's father, Clyde Aaron Lowe, stated "[t]hat son of a bitch killed him and, as far

22   as I'm concerned, you deserve the death penalty each and every one of you, because I

23   know that you helped him do it, no matter what you say" and "I don't care if you are

24   eighteen. You deserve to die. You don't deserve to live. You're scum, each and every

25   one of you." (*Id.* at 8.) Lowe's father also yelled, "Turn him loose and just let me know the

26   day he comes out of jail. Because, Brian, I would do exactly what you done [sic] to my

27   son if I had the chance." (*Id.* at 9.) The state district court instructed the jury that "[t]he

28   witnesses may also comment on what they think the sentence should be," and cautioned

1   the jury to focus its attention on the reason for the evidence, i.e., "the impact of the victim's
2   death on the family." (*Id.* at 10-11.)

3          The state district court later also instructed the jury it must determine the sentence
4   to be imposed on each of the defendants and explained the options: (1) life imprisonment
5   without the possibility of parole; (2) 20 years to life with the possibility of parole; or (3) 20
6   to 50 years imprisonment. (*Id.* at 48.) The court clarified the 50-year term meant the
7   defendant would be eligible for parole after 20 years but did not mean he would be paroled
8   after 20 years. (*Id.*) The court explained a sentence of life with the possibility of parole
9   meant the defendant would be eligible for parole after 20 years but did not mean he would
10  be paroled after 20 years. (*Id.* at 48–49) The court explained that life without the possibility
11  of parole meant the defendant would not be eligible for parole, and the pardon board was
12  prohibited from changing a sentence of life without the possibility of parole to a sentence
13  of life with the possibility of parole. (*Id.* at 49.) Finally, the court explained a sentence of
14  life with the possibility of parole meant the defendants were not eligible for parole until
15  after 40 years due to the deadly weapon enhancement. (*Id.* at 49-50.) The court instructed
16  "the case of each defendant should be considered separately and individually" in making
17  its sentencing decision. (*Id.* at 50.)

18         The state argued the harsh words and demeanor of Paul's father was evidence of
19  a father's grief over the loss of his son. (*Id.* at 52.) Based on their relative culpability for
20  the killing of Lowe, the state argued (1) for the maximum sentence of life without parole
21  for Snapp as the "driving force"; (2) 20 years to life for Marquez and Camacho; and (3)
22  20 to 50 years for Ruiz. (*Id.* at 53-56.) The jury sentenced Snapp, Marquez, and
23  Camacho, as equally culpable, to 20 years to life with the possibility of parole, and
24  sentenced Ruiz to a 50-year term. (*Id.* at 71-75.) At the postconviction evidentiary hearing,
25  trial counsel testified he did not consider objecting to the victim's testimony about their
26  sentencing opinions. (ECF No. 22-5 at 24.)

27  ///

28  ///

42

### 2.    Legal Standard

According to *Payne v. Tennessee*, a jury considering the death penalty may consider victim-impact evidence as it relates to the victim's character and the emotional impact of the murder on the victim's family. *See* 501 U.S. 808, 827, 830 n.2 (1991), *overruling Booth v. Maryland*, 482 U.S. 496 (1987) and *South Carolina v. Gathers*, 490 U.S. 805 (1989)). *Payne* overruled *Booth* and *Gathers* to the extent they held evidence and argument related to the victim and the impact of the victim's death on the family are inadmissible at a capital sentencing hearing. *See Payne*, 501 U.S. at 830 n.2. However, *Payne* expressly declined to overrule *Booth's* holding that admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence, violates the Eighth Amendment, because no evidence of that sort was presented in *Payne*. *See id.* Notably, *Booth* restricted its holding to victim statements in capital proceedings. *See* 482 U.S. at 509 n.12 ("We imply no opinion as to the use of [victim impact] statements in noncapital cases."). The Supreme Court has, however, stated that "the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief" from the introduction of unduly prejudicial evidence that renders a trial fundamentally unfair. *See Payne*, 501 U.S. at 825 (citation omitted).

### 3.    The Nevada Court of Appeals' Determination

The Nevada Court of Appeals rejected this claim as follows.

> [A]ppellant argues that his trial counsel was ineffective for failing to object to prejudicial victim-impact testimony during the penalty hearing as the deceased victim's parents called the defendants disparaging names and stated a wish that the defendants could be sentenced to death. Appellant fails to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. Given the nature of the victim-impact testimony and when placed in context, appellant fails to demonstrate that objectively reasonable counsel would have objected during the victim's parents' statements. *See* NRS 176.015(3)(b) (victims may "[r]easonably express any views concerning the crime, the person responsible, the impact of the crime on the victim and the need for restitution"); *see also Gallego v. State*, 117 Nev. 348, 370, 23 P.3d 227, 242 (2001) ("A victim can express an opinion regarding the defendant's sentence . . . in non-capital cases."), *overruled on other grounds by Nunnery v. State*, 127 Nev. ___, 263 P.3d 235 (2011). Appellant fails to demonstrate a reasonable probability of a different outcome had counsel objected during the victim-impact testimony. *See Dieudonne v. State*, 127 Nev. ___, ___ n.3, 245 P.3d 1202, 1207 n.3 (2011)

(recognizing that admission of victim-impact statements is reviewed for harmless error). Therefore, the district court did not err in denying this claim.

(ECF No. 38-25 at 5-6.)

### 4.    Analysis

The Nevada Court of Appeals reasonably applied *Strickland* in determining counsel's failure to object to testimony about the victim's opinions concerning Marquez's sentence was neither deficient nor prejudicial.

Although it did not occur to counsel to object to the victim opinions, objection was futile because, as the court indicated, under Nevada law at the time of Marquez's sentencing, victims could voice opinions concerning sentencing in noncapital cases. The state appellate court also reasonably determined there was no reasonable probability the result of the proceedings would have been different had counsel objected. Three of the victims expressed a desire that the defendants receive life sentences. One of those witnesses also stated she would have been "tickled" had they received a death sentence but acknowledged that was impossible under the circumstances. Lowe's father expressed his wish that the defendants be sentenced to death, but the jury was not permitted to render a death sentence and the state argued Lowe's father's opinions should be considered the product of his grief. Finally, Marquez was not unduly prejudiced because counsel correctly argued Marquez would serve a minimum of 40 years in prison before he could be paroled, whether the jury imposed a sentence of 20 to 50 years or a life sentence with the possibility of parole, and Marquez specifically asked the jury to sentence him in a way that permitted him the possibility of parole in 40 years.

On this record, the state appellate court reasonably applied *Strickland* in determining Marquez failed to show counsel's performance was deficient or prejudicial. Therefore, Marquez is not entitled to federal habeas corpus relief for Ground 8.

### G.    Ground 9—Failure to Request Concurrent Sentences

Marquez contends trial counsel's failure to request concurrent sentences denied him effective assistance of counsel, equal protection, and due process, and counsel's

1    failure resulted in a cruel and unusual sentence, in violation of the Fifth, Sixth, Eighth, and

2    Fourteenth Amendments. (ECF No. 14 at 29-30.)

3                    **1.    The Nevada Court of Appeals' Determination**

4            The state appellate court rejected this claim as follows. "[A]ppellant argues that his

5    trial counsel was ineffective for failing to request that all sentences be imposed

6    concurrently. Appellant cannot demonstrate any deficiency regarding this claim because

7    counsel argued for all sentences to be imposed concurrently. Therefore, the district court

8    did not err in denying this claim." (ECF No. 38-25 at 6.)

9                    **2.    Analysis**

10           The Nevada Court of Appeals' application of *Strickland* was objectively

11   reasonable. Following the jury's sentence of life with the possibility of parole for Marquez's

12   first-degree murder conviction, the state district court held a penalty hearing on the

13   remaining convictions for all defendants. (ECF No. 34-2.) At that hearing, Snapp's

14   counsel, referring to the convictions for battery with a deadly weapon on Bobby and Billy

15   (counts 4 and 5), requested "with respect to [counts] 4 and 5, we would ask that the

16   sentence recommended by the Division be imposed concurrently." (*Id.* at 8-9.) Snapp's

17   counsel further argued "This is a single criminal transaction" and asked, "that all counts

18   run concurrently." (*Id.* at 9.) Marquez's counsel stated "the basic argument for concurrent

19   time as to all the remaining charges, given the Court's sentence of life with the possibility

20   of parole, meaning 40 years, for Mr. Marquez, I would echo" the argument of Snapp's

21   counsel. (*Id.* at 9.) Marquez's counsel also specifically asked the state district court to

22   impose "concurrent time as to all the remaining charges." (*Id.* at 90-91.) The court ruled

23   Marquez's sentences for counts 1, 2 and 3 shall run concurrent with each other, and that

24   the sentences for counts 4 and 5 shall run "consecutive to all other sentences in this

25   matter." (ECF No. 20-2 at 2-3.)

26           Because the state appellate court reasonably concluded that counsel requested

27   concurrent sentences for each charge, and the trial court rejected that suggestion,

28

1   Marquez has failed to establish that counsel's performance was deficient or prejudicial.

2   Therefore, Marquez is not entitled to federal habeas relief for Ground 9.

3           **H.   Ground 11—Cumulative Error**

4         Marquez contends his conviction and sentence should be vacated based on

5   cumulative error in the exhausted portions of Grounds 1 through 10. (ECF No. 14 at 32.)

6              **1.   Legal Standard**

7         The U.S. Supreme Court has clearly established that the combined effect of

8   multiple trial errors violates due process if it renders a trial fundamentally unfair, even

9   where each error considered individually would not require reversal. *See Parle v.*

10   *Runnels*, 505 F.3d 922, 927-28 (9th Cir. 2007) (citing *Donnelly v. DeChristoforo,* 416 U.S.

11   637, 643 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 298, 302-03

12   (1973)). "[C]umulative error warrants habeas relief only where the errors have 'so infected

13   the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.*

14   (quoting *Donnelly*, 416 U.S. at 643.) "Such 'infection' occurs where the combined effect

15   of the errors had a 'substantial and injurious effect or influence on the jury's verdict.'" *Id.*

16   (citing *Brecht*, 507 U.S. at 637).

17              **2.   The Nevada Court of Appeals' Determination**

18         Marquez made no cumulative error claim on state court direct appeal; however, he

19   made such a claim in state postconviction proceedings. (ECF Nos. 20, 38-25 at 7.) The

20   state appellate court denied this claim in postconviction proceedings:

21          [A]ppellant argues that the cumulative effect of ineffective assistance of
       counsel warrants vacating the judgment of conviction. Appellant fails to

22          demonstrate that any errors, even if considered cumulatively, amount to
       ineffective assistance of counsel sufficient to warrant vacating the judgment

23          of conviction. Therefore, the district court did not err in denying this claim.

24   (ECF No. 38-25 at 7.)

25              **3.   Analysis**

26         Like the state appellate courts, the Court finds no prejudicial error for any of the

27   unexhausted portions of Marquez's ineffective assistance of counsel claims. The state

28   appellate court's application of Supreme Court authority in rejecting this claim was

1   therefore neither contrary to, nor an unreasonable application of, clearly established

2   Supreme Court authority, and was not based on an unreasonable determination of the

3   facts. Therefore, Marquez is not entitled to federal habeas relief for Ground 11.

4          I.      **Ground 12—Sufficiency of Evidence**

5          Marquez contends there is insufficient evidence to support his convictions. (ECF

6   No. 14 at 32-34.) In particular, he contends there was insufficient evidence to support his

7   intent to commit a felony at the time he entered the apartment. (*Id.* at 32.)

8          1.      **Legal Standard**

9          According to *Jackson v. Virginia*, a jury's verdict must stand if, "after viewing the

10  evidence in the light most favorable to the prosecution, *any* rational trier of fact could find

11  the essential elements of the offense beyond a reasonable doubt." 443 U.S. 307, 319

12  (1979) (emphasis in original). A federal habeas petitioner faces a "considerable hurdle"

13  when challenging the sufficiency of evidence to support his conviction. *Davis v. Woodford*,

14  384 F.3d 628, 639 (9th Cir. 2004). The *Jackson* standard is applied "with explicit reference

15  to the substantive elements of the criminal offense as defined by state law." *Id.* (quoting

16  *Jackson*, 443 U.S. at 324 n.16.) A reviewing court, "faced with a record of historical facts

17  that support conflicting inferences must presume—even if it does not affirmatively appear

18  in the record—that the trier of fact resolved any conflicts in favor of the prosecution, and

19  must defer to that resolution." *Id.* (quoting *Jackson*, 443 U.S. at 326.)

20         When the deferential standards of AEDPA and *Jackson* are applied together, the

21  question for decision on federal habeas review is whether the state court's decision

22  unreasonably applied the *Jackson* standard to the evidence at trial. *See, e.g.*, *Juan H. v.*

23  *Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005) (citations omitted). Thus, when a

24  petitioner's challenge to the sufficiency of the evidence is subject to AEDPA, "there is a

25  double dose of deference that can rarely be surmounted." *See Boyer v. Belleque*, 659

26  F.3d 957, 964-65 (9th Cir. 2011) (noting the *Jackson* standard is deferential because it

27  only permits relief when "no rational trier of fact" could find the essential elements for guilt

28

47

1    beyond a reasonable doubt, and AEDPA "adds a second level of deference" by permitting

2    relief only where a state court's application of *Jackson* is "objectively unreasonable.")

3                    **2.     The Nevada Supreme Court's Determination**

4            The Nevada Supreme Court rejected this claim on direct appeal as follows. "[W]e

5    have also considered Marquez's remaining arguments, including those related to . . .

6    sufficiency of the evidence . . . and conclude that none of these alleged errors deprived

7    Marquez of a fair trial." (ECF No. 20 at 11–12.) The court further explained:

8            With respect to Marquez's argument regarding sufficiency of the evidence,
             we note that while evidence may have conflicted regarding whether or not
9            Snapp had an ownership interest in the contents of the apartment safe, it is
             the task of the jury, not this court to determine the weight and credibility of
10           evidence presented at trial. Hutchins v. State, 110 Nev.103, 107-08, 867
             P.2d 1136, 1139 (1994). In this case, viewed in the light most favorable to
11           the prosecution, sufficient evidence existed for a reasonable trier of fact to
             find Marquez guilty of all crimes charged, including robbery with a deadly
12           weapon. See id.

13   (ECF No. 20 at 12 n.27.)

14                   **3.     Analysis**

15           The Nevada Supreme Court's application of *Jackson* to Marquez's sufficiency of

16   evidence claims was objectively reasonable on this record. To further clarify, the Court

17   examines the evidence supporting each crime for which Marquez was charged.

18                   **a.     Battery**

19           At the relevant time, battery was defined as "any willful and unlawful use of force

20   or violence upon the person of another." NRS § 200.481(1)(a), *as amended through* 2005

21   Laws, c. 64, § 3, eff. Oct. 1, 2005. Assault was defined as "[i]ntentionally placing another

22   person in reasonable apprehension of immediate bodily harm." NRS § 200.471(1)(a), *as*

23   *amended through* 2005 Laws, c. 64, § 2, eff. Oct. 1, 2005. A rational jury could find

24   Marquez committed a battery on Billy and Bobby Wood with use of a deadly weapon. Billy

25   Wood testified Marquez entered his home and immediately hit him on the head with a

26   baseball bat. Billy Wood further testified he sustained injuries to his head. Bobby Wood

27   testified he entered his apartment, Marquez struck him with a baseball bat, and he

28   suffered injuries all over his body.

1

### b.   Burglary

2   A person is guilty of burglary if they enter an apartment with the intent to commit

3   assault or battery on any person or any felony. NRS § 205.060(1), *as amended through*

4   2005 Laws, c. 126, § 1, eff. May 19, 2005. "A person convicted of burglary who has in his

5   or her possession or gains possession of any . . . deadly weapon at any time during the

6   commission of the crime, at any time before leaving the structure or upon leaving the

7   structure, is guilty of a category B felony." NRS § 205.060(4), *as amended through* 2005

8   Laws, c. 126, § 1, eff. May 19, 2005. As relevant here, "[t]he offense of burglary is

9   complete when the house or other building is entered with specific intent to commit

10  [assault or battery on any person]." NRS § 205.060(1); *Sheriff, Clark Cnty., Nevada v.*

11  *Stevens*, 630 P.2d 256, 257 (Nev. 1981) (citation omitted). "[W]here the intent is material,

12  the intent need not be proved by positive or direct evidence but may be inferred from the

13  conduct of the parties and the other facts and circumstances disclosed by the evidence."

14  *Moore v. State*, 126 P.3d 508, 513 (Nev. 2006) (citations omitted).

15  A rational jury could find Marquez committed a burglary with use of a deadly

16  weapon. Billy Wood testified Marquez, armed with a baseball bat, entered the apartment,

17  and without saying a word, immediately hit him in the head with the bat. A reasonable jury

18  could infer from Marquez's possession of the bat upon entry and his immediate use of the

19  bat, that Marquez had the specific intent to commit an assault and/or battery on the

20  occupants of the apartment when he entered the apartment. A reasonable jury could also

21  infer Marquez had the specific intent to commit assault and/or battery when he entered

22  the apartment based on Marquez's statement that he took a baseball bat to the apartment

23  intending to act as "back up" while Snapp retrieved his property.

### c.   Robbery

24

25  At the relevant time, "robbery" was defined as "the unlawful taking of personal

26  property from the person of another, or in the person's presence against his or her will,

27  by means of force or violence or fear of injury, immediate or future," and "to his or her

28  person or property, or the person or property of a member of his or her family, or of anyone

49

in his or her company at the time of the robbery." NRS. § 200.380, *as amended through* Laws 1995, p. 1187. Robbery is a general intent crime. *Coats v. State*, 643 P.2d 1225, 1226 (Nev. 1982) (citation omitted).

A rational jury could find Marquez guilty of attempted robbery with use of a deadly weapon, based on Marquez's entry into the apartment with a baseball bat, his admission that he went to the apartment to obtain money that did not belong to him, and his statement that he took the bat to serve as "back up" for Snapp.

### d.    Felony-Murder

As relevant here, Nevada defines first-degree felony-murder as, *inter alia*, murder which is committed in the perpetration or attempted perpetration of robbery or burglary. NRS § 200.030(1)(b), *as amended through* 2003 Laws, c. 137, § 7, eff. Oct 1, 2003. The intent required for the underlying felony, such as that required for an underlying robbery or burglary, "[i]s deemed, by law, to supply the malicious intent necessary to characterize the killing as a murder, and because felony murder is defined by statute as first-degree murder, no proof of the traditional factors of willfulness, premeditation, or deliberation is required for a first-degree murder conviction." *State v. Contreras*, 46 P.3d 661, 662 (Nev. 2002) (footnote omitted).

Conspiracy is "an agreement between two or more persons for an unlawful purpose." *Thomas v. State*, 967 P.2d 1111, 1122 (Nev. 1998). Conspiracy is seldom demonstrated by direct proof and is usually established by inference from the parties' conduct. *Id.* Evidence of a coordinated series of acts furthering the underlying offense is sufficient to infer the existence of an agreement and support a conspiracy conviction. *Id.* However, absent an agreement to cooperate in achieving the purpose of a conspiracy, mere knowledge of, acquiescence in, or approval of that purpose does not make one a party to conspiracy. *Doyle v. State*, 921 P.2d 901, 911 (Nev. 1996) *overruled on other grounds* by *Kaczmarek v. State,* 91 P.3d 16, 29 (Nev. 2004).

Under NRS § 195.020, every person concerned in the commission of a felony, whether he directly commits the act constituting the offense or aids or abets in its

50

commission, is guilty as a principal. "[I]n order for a person to be held accountable for the specific intent crime of another under an aiding or abetting theory of principal liability, the aider or abettor must have knowingly aided the other person with the intent that the other person commit the charged crime." *Sharma v. State*, 56 P.3d 868, 872 (Nev. 2002). "[I]ntent can rarely be proven by direct evidence of a defendant's state of mind, but instead is inferred by the jury from the individualized, external circumstances of the crime, which are capable of proof at trial." *Id.* at 659 (footnote omitted).

A rational jury could find Marquez guilty of felony-murder with use of a deadly weapon based on (1) the evidence supporting his conviction for burglary with use of a deadly weapon; (2) Lowe's death resulted from wounds sustained during the burglary; (3) Marquez's use of the bat and struggles with the occupants; and (4) Marquez's statement that he intended to serve as "back up" for Snapp. Marquez's statement afforded a rational jury a basis to infer Marquez was guilty of aiding and abetting, if not conspiring, to commit the necessary crime for felony-murder. The jury could reasonably infer Marquez harbored the specific and general intent necessary for the convictions, without considering the intent of any of the codefendants.

The state supreme court reasonably applied *Jackson* in its determination that sufficient evidence supports the convictions. Marquez is thus not entitled to federal habeas relief for Ground 12.

## V.   CERTIFICATE OF APPEALABILITY

This is a final order adverse to Marquez. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability ("COA"). This Court therefore has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Under § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find

1    the district court's assessment of the constitutional claims debatable or wrong." *Slack*,

2    529 U.S. at 484 (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

3         Applying this standard, the Court finds a certificate of appealability is warranted for

4    Grounds 1 and 6, but for no other grounds. For Grounds 1 and 6, jurists of reason could

5    debate whether the state courts reasonably applied Supreme Court authority in

6    determining the requisite *Miranda* warnings were substantially conveyed and that counsel

7    was not ineffective in failing to move to suppress Marquez's statements, given the police

8    deviated from normal legal modes of procedure in the *Miranda* warnings given to

9    Marquez.[13] *See Slack,* 529 U.S. at 484.

10        However, reasonable jurists would not find the Court's procedural ruling dismissing

11   Grounds 4, 5, 10 as entirely unexhausted, debatable or wrong and reasonable jurists

12   would not find it debatable whether this Court was correct in its procedural ruling

13   dismissing the unexhausted portions of Grounds 1, 3, 7 and 11. (ECF Nos. 77, 80.) A

14   certificate of appealability is therefore denied as to those grounds.

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26

27   ―――――――――――――

     [13]"Those who framed our Constitution, and the Bill of Rights were ever aware of
28   subtle encroachments on individual liberty. They knew that 'illegitimate and
     unconstitutional practices get their first footing by silent approaches and slight deviations
     from legal modes of procedure.'" *Miranda*, 384 U.S. at 459 (citation omitted).

1

## VI.    CONCLUSION

It is therefore ordered that the petition for writ of habeas corpus (ECF No. 14) is denied in its entirety as explained herein.

It is further ordered that a certificate of appealability is granted for Ground 1 and Ground 6 only. A certificate of appealability is denied for all other grounds in the petition.

The Clerk of Court is directed to substitute Tim Garrett for Respondent E.K. McDaniel.

The Clerk of Court is further directed to enter judgment accordingly and close this case.

DATED THIS 14th Day of March 2022.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE